# REUBEN QUICK BEAR *v.* LEUPP, COMMISSIONER OF INDIAN AFFAIRS.

## APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 569.   Argued February 26, 27, 1908.—Decided May 18, 1908.

A statutory limitation on expenditures of the public funds does not, in the absence of special provision to that effect, relate to expenditures of treaty and trust funds administered by the Government for the Indians.

The provisions in the Indian Appropriation Acts of 1895, 1896, 1897, 1898 and 1899 limiting and forbidding contracts for education of Indians in sectarian schools relate only to appropriations of public moneys raised by general taxation from persons of all creeds and faith and gratuitously appropriated and do not relate to the disposition of the tribal and trust funds which belong to the Indians—in this case the Sioux Tribe—themselves, and the officers of the Government will not be enjoined from carrying out contracts with sectarian schools entered into on the petition of Indians and to the *pro rata* extent that the petitioning Indians are interested in the fund.

A declaration by Congress that the Government shall not make appropriations for sectarian schools does not apply to Indian treaty and trust funds on the ground that such a declaration should be extended thereto under the religion clauses of the Federal Constitution.

35 Washington Law Reporter, 766, affirmed.

THE appellants filed their bill in equity in the Supreme Court of the District of Columbia, alleging that:

"1. The plaintiffs are citizens of the United States, and members of the Sioux tribe of Indians of the Rosebud Agency, in the State of South Dakota, and bring this suit in their own right as well as for all other members of the Sioux tribe of Indians of the Rosebud Agency.

"2. The defendants are citizens of the United States and residents of the District of Columbia, and are sued in this action as the Commissioner of Indian Affairs, the Secretary of the Interior, the Secretary of the Treasury, the Treasurer of

the United States, and the Comptroller of the Treasury respectively.

"3. That by article VII of the Sioux treaty of April 29, 1868 (15 Stat. 635, 637), continued in force for twenty years after July 1, 1889, by section 17 of the act of March 2, 1889, c. 405, 25 Stat. 888, 894–5, the United States agreed that for every thirty children of the said Sioux tribe who can be induced or compelled to attend school, a house shall be provided, and a teacher competent to teach the elementary branches of an English education, shall be furnished, who will reside among said Indians and faithfully discharge his or her duties as a teacher.

"4. That for the purpose of carrying out the above provision of the said treaty during the fiscal year ending June 30, 1906, the following appropriation was made by the act of March 3, 1905, section 1 (33 Stat. 1048, 1055):

"'For support and maintenance of day and industrial schools, including erection and repairs of school buildings in accordance with article seven of the treaty of April twenty-nine, eighteen hundred and sixty-eight, which article is continued in force for twenty years by section seventeen of the act of March second, eighteen hundred and eighty-nine, two hundred and twenty-five thousand dollars.'

"The fund so appropriated is generally known as the Sioux treaty fund.

"5. That section 17 of the said act of March 2, 1889, further provides as follows:

"'And in addition thereto there shall be set apart out of any money in the Treasury not otherwise appropriated, the sum of three million dollars, which said sum shall be deposited in the Treasury of the United States to the credit of the Sioux Nation of Indians as a permanent fund, the interest of which, at five per centum per annum, shall be appropriated, under the direction of the Secretary of the Interior to the use of the Indians receiving rations and annuities upon the reservations created by this act, in proportion to the numbers that shall

so receive rations and annuities at the time that this act takes effect, as follows: one-half of said interest shall be so expended for the promotion of industrial and other suitable education among said Indians, and the other half thereof in such manner and for such purposes, including reasonable cash payments *per capita* as, in the judgment of said Secretary, shall, from time to time, most contribute to the advancement of said Indians in civilization and self-support.'

"This fund of three million dollars is generally known as the Sioux trust fund.

"6. That the interest on the said Sioux trust fund is paid annually by the United States in accordance with the provisions of the second clause of the act of April 1, 1880, c. 41, 21 Stat. 70, reading as follows:

"'And the United States shall pay interest semi-annually, from the date of the deposit of any and all such sums in the United States Treasury, at the rate per annum stipulated by treaties or prescribed by law, and such payments shall be made in the usual manner, as each may become due, without further appropriation by Congress.'

"7. That the act of June 7, 1897, c. 3, § 1, 30 Stat. 62, 79, contains the following provision:

"'And it is hereby declared to be the settled policy of the Government to hereafter make no appropriation whatever for education in any sectarian school.'

"8. That, in violation of the said provision of the act of June 7, 1897, the said Francis E. Leupp, Commissioner of Indian Affairs as aforesaid, has made or intends to make, for and on behalf of the United States, a contract with the Bureau of Catholic Indian Missions of Washington, D. C., a sectarian organization, for the care, education, and maintenance, during the fiscal year ending June 30, 1906, of a number of Indian pupils of the said Sioux tribe, at a sectarian school on the said Rosebud Reservation, known as the St. Francis Mission Boarding School, and in the said contract has agreed to pay or intends to agree to pay to the said Bureau of Catholic Indian

Missions of Washington, D. C., a certain rate per quarter as compensation for every pupil in attendance at the said school under the said contract, the said payment (which, as the plaintiffs are informed and believe, will amount to the sum of twenty-seven thousand dollars), to be made either from the said Sioux treaty fund or from the interest of the said Sioux trust fund or from both.

"9. That all payments made to the said Bureau of Catholic Indian Missions of Washington, D. C., under the said contract, either out of the said Sioux treaty fund or out of the interest of the said Sioux trust fund, will be payments for education in a sectarian school, and will be unlawful diversions of funds appropriated by Congress, and in violation of the above-recited provision of the act of June 7, 1897, and such payments will seriously deplete the interest of said Sioux trust fund, to the great injury of the plaintiffs and all other members of the said Sioux tribe of Indians of the Rosebud Agency, and will unlawfully diminish the amount of money which should be expended out of the said Sioux treaty fund and the interest of the said Sioux trust fund for lawful purposes, for the benefit of the said plaintiffs and all other members of the said Sioux tribe of Indians of the Rosebud Agency, and will also unlawfully diminish the cash payments which the said plaintiffs and all other members of the said Sioux tribe of Indians of the Rosebud Agency are entitled to receive *per capita* out of the interest of the said Sioux trust fund.

"10. That the plaintiffs have never requested nor authorized the payment of any part of the said Sioux treaty fund, or of the interest of the said Sioux trust fund, to the said Bureau of Catholic Indian Missions of Washington, D. C., or any other person or organization whatever, for the education of Indian pupils of the said Sioux tribe in the said St. Francis Mission Boarding School, or any other sectarian school whatever, but have on the contrary protested against any use of either of the said funds, or the interest of the same, for the purpose of such education.

"11. That the plaintiffs have no remedy at law.

"Wherefore the plaintiffs ask relief, as follows:

"I. That a permanent injunction issue against the said Francis E. Leupp, Commissioner of Indian Affairs, to restrain him from executing any contract with the said Bureau of Catholic Indian Missions of Washington, D. C., or any other sectarian organization whatever, for the support, education, or maintenance of any Indian pupils of the said Sioux tribe at the said St. Francis Mission Boarding School, or any other sectarian school on the said Rosebud Reservation or elsewhere, and that a permanent injunction issue against the said Francis E. Leupp, Commissioner of Indian Affairs, and the said Ethan Allen Hitchcock, Secretary of the Interior, to restrain them from paying or authorizing the payment of, either by themselves or by any of their subordinate officers or agents whatever, any moneys of either the said Sioux treaty fund or the interest of the said Sioux trust fund, or any other fund appropriated, either by permanent appropriation or otherwise for the uses of the said Sioux tribe, to the said Bureau of Catholic Indian Missions of Washington, D. C., or to any other sectarian organization whatever, for the support, education, or maintenance of any Indian pupils of the said Sioux tribe, at the said St. Francis Mission Boarding School or any other sectarian school on the said Rosebud Reservation or elsewhere."

II. And for a permanent injunction against the drawing, countersigning and paying "any warrants in favor of the said Bureau of Catholic Indian Missions of Washington, D. C., or any other sectarian organization whatever, for the support, education, and maintenance of any Indian pupils of the said Sioux tribe at the said St. Francis Mission Boarding School, or any other sectarian school on the said Rosebud Reservation or elsewhere, payable out of any money appropriated, either by permanent appropriation or otherwise, for the uses of the said Sioux tribe."

III. And for general relief.

The defendants answered, 1. Admitting "that the plaintiffs are citizens of the United States, and members of the Sioux tribe of Indians, but aver that the said Indians are only nominal plaintiffs, the real plaintiff being the Indian Rights Association, who have had this suit brought for the purpose of testing the validity of the contract hereinafter referred to."

2. Admitting "that they are residents of the District of Columbia, and are sued in this action as Commissioner of Indian Affairs, the Secretary of the Interior, the Secretary of the Treasury, the Treasurer of the United States, and the Comptroller of the Treasury, respectively. These defendants, as officers of the Government of the United States, have no interest in the controversy raised by the bill, except to perform their duties under the law, and they, therefore, as such officers, respectfully submit the validity of the contract hereinafter referred to, and the payments thereunder, to the judgment of this honorable court. The real defendant in interest is the 'Bureau of Catholic Indian Missions,' a corporation duly incorporated by chapter 363 of the Acts of Assembly of Maryland for the year 1894, for the object, *inter alia*, of educating the American Indians directly and also indirectly by training their teachers and others, especially to train their youth to become self-sustaining men and women, using such methods of instruction in the principles of religion and of human knowledge as may be best adapted to these purposes.

"As the object of the bill filed is to test the validity of a contract made between the Commissioner for Indian Affairs and the said 'Bureau of Catholic Indian Missions,' and the validity of the payment of the money thereunder, this answer will set forth the facts and the statutes of the United States under which it is contended that such contract and the payment of money thereunder are valid."

This the answer then did at length, and inasmuch as the case was submitted on bill and answer with certain statements of the Commissioner of Indian Affairs, it is thought that the an-

swer should be given substantially in full as it is in the margin.[1]

The case was heard on the bill, the answer and "certain

[1] "3. These defendants admit the allegations of paragraph 3 of the bill, but the pertinent part of the Sioux treaty of April 29, 1868, is only partially stated therein. The full statement of that part of the Sioux treaty will be hereinafter made.

"4. These defendants admit the allegations of paragraph 4 of the bill.

"5. These defendants admit the allegations in paragraph 5 of the bill, but aver that though the provision from section 17 of the act of March 2, 1889, is correctly stated, as far as it goes, there are other portions of said act which should be called to the attention of the court, which is accordingly done hereafter in this answer.

"6. These defendants admit the allegations in paragraph 6 of the bill, but aver, that although clause 2 of the act of April, 1880, is correctly stated, as far as it goes, there are other provisions of law to be called to the attention of the court in this connection, which is accordingly done in the subsequent part of this answer.

"7. These defendants admit the allegations in paragraph 7 of the bill, but aver that, although the provision in the act of June 7, 1897, sec. 1, is correctly stated as far as it goes, the section is not fully stated, nor are other parts of the act referred to which bear directly on the question raised by the bill.

"8. These defendants admit that within the meaning of the acts of Congress the 'Bureau of Catholic Indian Missions' is a sectarian organization, and the industrial school known as the 'St. Francis Mission Boarding School,' on the Rosebud Reservation, is a sectarian school.

"These defendants further say that a contract was made by and between F. E. Leupp, Commissioner of Indian Affairs, for and on behalf of the United States of America, and the 'Bureau of Catholic Indian Missions,' for the care, education, and maintenance during the fiscal year ending June 30, 1906, of 250 Indian pupils of the Sioux tribe of Indians, at the industrial school known as St. Francis Mission Boarding School, on the Rosebud Reservation, and by such contract it was agreed that there should be paid to the 'Bureau of Catholic Indian Missions' twenty-seven dollars ($27) per quarter for every pupil in attendance, provided there should not be paid under the contract a sum aggregating more than twenty-seven thousand dollars ($27,000). This amount, according to the contract, was to be paid from either or all of the funds of the Sioux tribe of Indians, designated technically as 'Interest on Sioux Fund,' 'Education Sioux Nation,' and 'Support of Sioux of different tribes, subsistence, and civilization,' all of which, however, are embraced in the two funds stated in the bill, to wit, the 'Sioux Treaty Fund,' described in paragraph 4 of the bill and the 'Sioux Trust Fund,' described in paragraph 5 of the bill.

"This contract has been fully performed by the 'Bureau of Catholic In-

proofs, consisting of replies made by the Commissioner of Indian Affairs to certain questions asked in behalf of the plaintiffs, and also of certain statements in the reports of the

dian Missions' and there is due to it thereunder from the said funds the total amount of twenty-seven thousand dollars ($27,000) if the said contract was legally made. This contract was approved by the Acting Secretary of the Interior, Mr. Jesse E. Wilson, by direction of the President of the United States, but, by the same direction, no payments have been made under it in order that the validity of the contract might be determined by the courts, of the United States. The circumstances under which this contract was entered into and approved are hereinafter more fully stated.

"These defendants deny the allegation in paragraph 8 of the bill that this contract was made in violation of the act of June 7, 1897, or in violation of any other act of Congress.

"9. These defendants admit that payments under this contract will be payments for education in a sectarian school, as the term 'sectarian school' is defined in the acts of Congress, but they deny that said payments will be in violation of the act of June 7, 1897, and they further deny that such payments will deplete the interest of said 'Sioux Trust Fund' to the injury of the plaintiffs and all other members of the said Sioux tribe of Indians of the Rosebud Agency; and they further deny that such payments will unlawfully diminish the amount of money which should be expended out of the said 'Sioux Treaty Fund,' and the interest of the 'Sioux Trust Fund' for lawful purposes for the benefit of the plaintiffs and all other members of the said Sioux tribe of Indians of the Rosebud Agency; and they further deny that said payments will also unlawfully diminish the cash payments which the said plaintiffs and other members of the said Sioux tribe of Indians of the Rosebud Agency are entitled to receive per capita out of the interest of the said 'Sioux Trust Fund,' as alleged in paragraph 9 of said bill; all of which will more fully and at large appear by the detailed statements in this answer hereinafter made.

"10. These defendants admit that the plaintiffs, to wit, the three Indians whose names appear as plaintiffs in the caption of this bill, have never requested or authorized the payment of any part of the Sioux treaty or trust fund to the said 'Bureau of Catholic Indian Missions,' or any other person or organization whatever for the education of Indian pupils of the said Sioux tribe in said 'St. Francis Mission Boarding School,' or any other sectarian boarding school whatever, but on the contrary, these defendants admit that the said plaintiffs protest against any use of either of the said funds, or the interest of the same, for the purpose of such education, as stated in paragraph 10 of the bill.

"11. But now these defendants further answering say, that although they have answered in terms all the allegations in all the paragraphs of the bill contained, it is necessary for a full understanding of the rights of the parties, that all the pertinent facts connected with the use of money under

Commissioner of Indian Affairs for the years 1895 and 1906, inclusive," and was argued by counsel, and upon consideration an injunction was decreed from "paying or authorizing the payment of, either by themselves or by any of their subordinate

the contract of the United States for the education of the Indians in contract schools which are sectarian within the meaning of the acts of Congress should be stated, so that in the light of all these facts, only a few of which are stated in the bill, the legality of the contract assailed may be judicially determined.

"12. The Catholic Missions schools were erected many years ago at the cost of charitable Catholics, and with the approval of the authorities of the Government of the United States, whose policy it was then to encourage the education and civilization of the Indians through the work of religious organizations. Under the provisions of the act of 1819, ten thousand dollars ($10,000) were appropriated for the purpose of extending financial help 'to such associations or individuals who are already engaged in educating the Indians,' as may be approved by the War Department.

"In 1820, twenty-one schools conducted by different religious societies were given eleven thousand, eight hundred and thirty-eight dollars ($11,838), and from that date until 1870, the principal educational work in relation to the Indians was under the auspices of these bodies, aided more or less by the Government. For a long time the different denominational schools referred to were aided by the Government without any formal contract.

"In 1870, an act of Congress was passed appropriating one hundred thousand dollars ($100,000) for the support of Indian schools among Indian tribes not otherwise provided for, i. e., among tribes not having treaty stipulations providing funds for educational purposes, and these appropriations continued until 1876. Contracts were made annually with the mission schools of the different denominations payable out of this appropriation for the education of Indian pupils. As to the tribes having funds for educational purposes under treaty stipulations, contracts were also made with the mission schools of the different denominations payable out of the treaty funds. In 1876, Congress began the general appropriation 'for the support of industrial schools and other educational purposes for the Indian tribes,' and these annual appropriations from the public moneys of the United States have been—from that time until the present. These appropriations always were put in the appropriation acts under the heading 'Support of Schools'—and from these public funds, and, in the discretion of the Commissioner of Indian Affairs, from the tribal funds hereinafter explained, were paid the amounts due under the contracts made by the Commissioner of Indian Affairs, with the approval of the Secretary of the Interior, with the various denominational schools for the education of Indian pupils.

"Some time before 1895 opposition developed to these contracts with denominational schools on the ground that the public moneys of the United

officers or agents whatever, any moneys of the Sioux treaty fund, referred to in the said bill and answer, appropriated for the uses of the Sioux tribe of Indians, to the Bureau of Catholic Indian Missions, at Washington, D. C., for the support, edu-

.··ies raised by taxation should not be used for education in sectarian institutions; and also for other reasons.

"Accordingly there is found in the appropriation act of 1894, ch. 290 (28 Statutes at Large, p. 311) approved August 15, 1894, in that part of the act appropriating the public moneys for the support of Indian schools and under the heading 'Support of Schools,' the following:

"'That the expenditure of money appropriated for school purposes under this act shall be at all times under the supervision and direction of the Commissioner for Indian Affairs and in all respects in conformity with such conditions, rules, and regulations as to the conduct of and methods of instruction and expenditure of money as may, from time to time, be prescribed by him, subject to the approval of the Secretary of the Interior.

"'Provided, that the Secretary of the Interior is hereby directed to inquire into and investigate the propriety of discontinuing contract schools and whether, in his judgment, the same can be done without detriment to the education of Indian children, and that he submit to Congress at the next session the result of such investigation, including an estimate of the annual cost, if any, of substituting Government schools for contract schools, together with such recommendations as he may deem proper.'

"In his annual report for the fiscal year ending June 30, 1894, the Secretary of the Interior said:

"'The contract schools are now the subject of general discussion. I agree fully with those who oppose the use of public money for the support of sectarian schools. But this question should be considered practically. The schools have grown up. Money has been invested in their construction at a time when they were recognized as wise instrumentalities for the accomplishment of good. I do not think it proper to allow the intense feeling of opposition to sectarian education, which is showing itself all over the land, to induce the department to disregard existing conditions. We need the schools now, or else we need a large appropriation to build schools to take their place.

"'It would scarcely be just to abolish them entirely—to abandon instantly a policy so long recognized. My own suggestion is that they should be decreased at the rate of not less than 20% a year. Thus, in a few years more, they would cease to exist, and during this time the bureau would be gradually prepared to do without them, while they might gather strength to continue without Government aid. This is the policy which is now controlling the department, and, unless it is changed by legislation, it will be continued. The decrease in the appropriation for the present fiscal year is 20%.'

"Congress, in pursuance of this recommendation, introduced for the first

cation or maintenance of any Indian pupils of the said Sioux tribe, at the St. Francis Mission Boarding School on the Rosebud Reservation in the State of South Dakota, as provided

time in the appropriation act of 1895, ch. 188 (28 Stat. at Large, 888), a limitation on the use of public money in sectarian schools.

"The act appropriates, under the heading 'Support of Schools,' of the public moneys of the United States 'for the support of Indian day and industrial schools and for other purposes ( . . . $1,164,350. . . .).

" 'Provided, that the Secretary of the Interior shall make contracts, but only with the present contract schools, for the education of Indian pupils during the fiscal year ending June 30, 1896, to an extent not exceeding 80% of the amount so used in the fiscal year 1895, and the Government shall, as early as practicable, make provision for the education of Indians in Government schools.' (See 28 Stat. at Large, 903.)

"Congress, in the Indian appropriation act of 1896, ch. 398, appropriated from the public moneys of the United States, under the head 'Support of Schools,' 'for support of Indian day and industrial schools and for other educational purposes, . . . $1,235,000, . . .' and then as a qualification upon the appropriation, and following immediately thereupon, under the same heading, 'Support of Schools,' occurs the following language in the act:

" 'And it is hereby declared to be the settled policy of the Government to hereafter make no appropriation whatever for education in any sectarian school. Provided, that the Secretary of the Interior may make contracts with contract schools and apportioning, as near as may be, the amount so contracted for among schools of various denominations for the education of Indian pupils during the fiscal year 1897, but shall only make such contracts at places where non-sectarian schools cannot be provided for such Indian children, and to an amount not exceeding 50% of the amount so used for the fiscal year 1895.' (See 29 Stat. at Large, p. 345.)

"Congress, in the Indian Appropriation Act of 1897, ch. 3, appropriated from the public moneys of the United States, under the head of 'Support of Schools,' 'for support of Indian day and industrial schools, and for other educational purposes . . . $1,200,000 . . .' and then as a qualification upon this appropriation, and following immediately thereupon, under the same heading, 'Support of Schools,' occurs the following language:

" 'And it is hereby declared to be the settled policy of the Government to hereafter make no appropriation whatever for education in any sectarian school. Provided, the Secretary of the Interior may make contracts with contract schools, apportioning as near as may be the amount so contracted for among schools of various denominations for the education of Indian pupils during the fiscal year 1898, but shall only make such contracts at places where non-sectarian schools cannot be provided for such Indian children, and to an amount not exceeding 40% of the amount so used for the fiscal year 1895.' (See 30 Stat. at Large, p. 79.)

in the contract referred to in said bill and answer, and that the defendants be further restrained from drawing, countersigning and paying any warrants in favor of the said Bureau of Catholic

"Congress, in the Indian Appropriation Act of 1898, ch. 545, appropriated from the public moneys of the United States, under the head of 'Support of Schools,' for 'support of Indian day and industrial schools, and for other educational purposes . . . $1,100,000 . . . Provided, that the Secretary of the Interior may make contracts with contract schools, apportioning as near as may be the amount so contracted for among schools of various denominations for the education of Indian pupils during the fiscal year of 1899, but shall only make such contracts at such places where nonsectarian schools cannot be provided for such Indian children, and to an amount not exceeding 30% of the amount so used for the fiscal year 1895.' (See 30 Stat. at Large, p. 587.)

"Congress, in the Indian Appropriation Act of 1899, ch. 324, appropriated from the public moneys of the United States, under the head of 'Support of Schools,' 'for support of Indian day and industrial schools, and for other educational purposes, . . . $1,100,000 . . . Provided, that the Secretary of the Interior may make contracts with contract schools, apportioning as near as may be the amount so contracted for among schools of various denominations for the education of Indian pupils during the fiscal year 1900, but shall only make such contracts at places where nonsectarian schools cannot be provided for such Indian children, and to an amount not exceeding 15% of the amount so used for the fiscal year 1895, the same to be divided proportionately among the said several contract schools, this being the final appropriation for sectarian schools.' (See 30 Stat. at Large, p. 942.)

"The several Indian annual appropriation acts since 1899, to wit, beginning with 1900 to the present time, contain under the head of 'Support of Schools' simply a general appropriation of public moneys 'for the support of Indian and industrial schools, and for other educational purposes,' without any proviso in any of them respecting contracts with sectarian schools, or without any statement in any of them of the policy of the Government with respect to sectarian schools.

"It will be observed that the phrase, 'and it is hereby declared to be the settled policy of the Government to hereafter make no appropriation whatever for education in any sectarian school,' which is cited and relied on in paragraph 7 of the bill, is found only in the Indian appropriation acts of 1896 and 1897, and in no prior or subsequent acts of Congress; that in these two acts it is a limitation on the appropriation of public moneys, and is found only under the heading 'Support of Schools,' under which the money of the United States is appropriated for support of Indian schools, and does not occur in any other part of these acts of Congress. These defendants, therefore, submit, that this statement of policy, in so far as it can now have any legal effect, was intended only to apply to appropriations of public

Indian Missions, for the purpose aforesaid, payable out of the said Sioux treaty fund; and

"It is further ordered, adjudged and decreed that so much of the prayer of the said bill as asks that an injunction issue

moneys for education in sectarian schools, and inasmuch as the appropriation of public moneys for these purposes was being reduced from year to year by a percentage which would make the last appropriation to be for the fiscal year ending June 30, 1900, there was no necessity for repeating the phrase containing the policy of the Government in any acts after 1897. The cessation of the appropriation from the public moneys for education in the sectarian schools, was treated as the accomplishment of the purpose contained in the statement of the policy found in the acts of 1896 and 1897.

"The above paragraph contains all the matter pertinent to the appropriation of public moneys for the support of education in sectarian schools. These appropriations ceased with the Indian appropriation act of 1899, have never been made since, nor is any one asking that they should be made, or that any public moneys of the United States raised by taxation should be employed for such purposes.

"13. But these defendants, further answering, say that entirely separate and apart from the public moneys which, as stated in paragraph 12 of this answer, were appropriated until 1899 for education in sectarian schools, there are other funds known as 'Tribal Funds' which may be applied for these purposes. These funds these defendants respectfully submit, are not public moneys, but really belong to the Indians themselves, and it is the purpose of this paragraph of this answer to give a general account of these funds, and a particular account of the 'Tribal Funds' of the Sioux Indians which are directly in controversy in this case will be given in the next paragraph.

"These 'Tribal Funds' may be roughly grouped into two classes: (a) Where cessions of land or other property have been made by the Indians, and in consideration thereof a certain sum of money is deposited in the Treasury of the United States, which is used for the Indians in the discretion of the Secretary of the Interior. These are called 'Trust Funds.' (b) Where cessions of land or other property have been made by the Indians under treaties, and in consideration therefor the Government of the United States has by treaty bound itself to furnish money for the civilization and education of the Indians. These are called 'Treaty Funds.'

"Examples of these funds are as follows:

"Menominee Fund: Interest, $7,651.96 per annum (Treaty of 1848, Art. 5, 9 Stat. at Large, 952).

"Menominee Log Fund: Interest, $76,313.98 per annum (Act of March 22, 1882, 22 Stat. at Large, 30; Act of June 12, 1890, 26 Stat. at Large, 146).

"Osage Fund: Interest, $416,371.95 per annum (Treaty 1865, Art. 2, 14 Stat. at Large, 687; Act July 15th, 1870, 16 Stat. at Large, 362; Act of June 16, 1880, 21 Stat. at Large, 292).

against the defendants restraining them from paying or authorizing the payment of any of the interest of the Sioux trust fund to the said Bureau of Catholic Indian Missions under the said contract, be refused; and

---

"Osage Fund: Interest on $69,120, 5% (Treaty Jan. 2d, 1825, for educational purposes per Senate resolution, Jan. 9, 1838, 7th Stat. at Large, 242).

"The yearly amounts provided for the Indians under treaties are annually appropriated in the Indian appropriation acts, not in that part of the act under the title 'Support of Schools' which appropriated the public money of the United States, but under the heading 'Fulfilling Treaty Stipulations with and support of Indian Tribes,' for although formally appropriated the moneys are not regarded as the moneys of the United States, but moneys belonging to the Indians, due to them under treaties in consideration of their cession of lands and other rights.

"But inasmuch as according to Indian custom, the property is held in common, and inasmuch as the Indians are regarded as wards of the Nation, the money is not distributed *per capita*, but is expended for them, and for their benefit and advantage, under the discretion of the Secretary of the Interior. For some of the laws conferring this discretion, see 14th Stat. 687; 16 Stat. 362; 21 Stat. 292; 22 Stat. 30; 25 Stat. 895; 26 Stat. 146, 344.

"14. As to the 'Sioux funds' directly in controversy, the facts are as follows:

"On March 2, 1889, the act of Congress of 1889, ch. 405, was approved. This was entitled 'An act to divide a portion of the reservation of the Sioux Nation of Indians in Dakota into separate reservations, and to secure the relinquishment of the Indian tribe to the remainder.' Under this act, the Indians made certain cessions of land, and in partial consideration therefor it was provided in section 17 of the act as follows:

"'And in addition thereto, there shall be set apart out of any sum in the Treasury not otherwise appropriated, the sum of three million dollars, which said sum shall be deposited in the Treasury of the United States to the credit of the Sioux Nation of Indians as a permanent fund, the interest on which at five per cent. per annum shall be appropriated under the direction of the Secretary of the Interior to the use of the Indians receiving rations and annuities upon the reservations created by this act in proportion to the number that shall so receive rations and annuities at the time that this act takes effect, as follows: One-half of said interest shall be so expended for the promotion of industrial and other suitable education among the said Indians, and the other half for such purposes, including reasonable cash payments *per capita*, as in the discretion of such Secretary, shall, from time to time, most contribute to the advancement of said Indians in civilization and self-support.' 25 Stat. at Large, 895.

"This is the fund called the 'Sioux Trust Fund' in the fifth paragraph of this bill.

"It is further ordered and adjudged that each party pay the respective costs by each incurred."

Each party prayed an appeal from so much of the decree as was adverse to them. It was stipulated "that the amount

"The method of the payment of the interest on this fund was changed in 1880 by the act of 1880, chapter 41, as follows:

"'The Secretary of the Interior be, and he is hereby authorized to deposit in the Treasury of the United States, any and all sums now held by him, or which may hereafter be received by him, as Secretary of the Interior and trustee of various Indian tribes, on account of the redemption of United States bonds or other stocks and securities belonging to the Indian trust fund, and all sums received on account of sales of Indian trust lands, and the sales of stocks lately purchased for temporary investment whenever he is of the opinion that the best interests of the Indians will be promoted by such deposits in lieu of investments, and the United States shall pay interest semi-annually from the date of deposit of any and all such sums in the United States Treasury, at the rate per annum stipulated by treaties, or prescribed by law, and such payments shall be made in the usual manner, as each may become due, without further appropriation by Congress.'

"This provision is partially cited in the bill in paragraph 6.

"15. Under a treaty between the United States and different tribes of Sioux Indians made on April 29, 1868 (15 Stat. at Large, 635), these Indians made large cessions of land and other rights, and in partial consideration therefor the United States agreed with them as follows:

"'Art. VII. In order to insure the civilization of the Indians entering into this treaty, the necessity of education is admitted, especially of those as are or may be settled on said agricultural reservations, and they therefore, pledge themselves to compel their children, male and female, between the ages of six and sixteen years to attend school, and it is hereby made the duty of the agent for said Indians to see that this stipulation is strictly complied with, and the United States agrees that for every thirty children between said ages who can be induced or compelled to attend school, a house shall be provided and a teacher competent to teach the elementary branches of our English education shall be furnished, who will reside among said Indians and faithfully discharge his or her duties as a teacher. This provision of this article to continue for not less than twenty years.'

"By the act of Congress of February 28, 1877, ch. 72 (19 Stat. at Large, 254–6), ratifying an agreement with bands of Sioux Nation, in consideration of further land cessions, it was provided:

"'In consideration of the foregoing cession of territory and rights and upon full compliance with each and every obligation assumed by the said Indians, the United States does agree to provide all necessary aid to assist the said Indians in the work of civilization to furnish to them schools and instructions in mechanical and agricultural arts as provided by the treaty of 1868.'

which was to have been paid from the Sioux treaty fund under the contract in regard to which this suit is brought is approximately $24,000."

"By the seventeenth section of the act of 1889, ch. 405 (25 Stat. at Large, 894), it was provided—

"'that the 7th article of the said treaty of April 29, 1868, securing to said Indians the benefit of education, subject to such modifications as Congress shall deem most effective to secure said Indians equivalent benefits of such education, shall continue in force for twenty years from and after the act shall take effect.'

"By the act of 1905, ch. 1479 (33 Stat. at Large, p. 1048), entitled—

"'An act making appropriations for current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June 30th, 1906, and for other purposes '—

"it was provided under the heading 'Fulfilling Treaty Stipulations with and Support of Indian Tribes' as follows:

"'For support of and maintenance of day and industrial schools, including erection and repairs of school buildings in accordance with art. 7 of the treaty of April 29th, 1868, which article was continued in force for twenty years by sec. 17 of the act of March 2, 1889, $225,000.'

"A similar appropriation has been annually made for many years back in the Indian appropriation acts.

"This is the 'Treaty Fund' in dispute, referred to in the 4th paragraph of the bill.

"These defendants respectfully represent that this 'Treaty Fund' does not differ from the 'Trust Fund,' in the main point that it is money belonging to the Indians and not public money of the United States.

"Both funds arise from cessions made by the Indians of lands and other rights. The one is a specific sum of which the United States is a trustee for the Indians; the other is an obligation payable in installments under the agreement of a treaty.

"These defendants, therefore, respectfully submit that as to both of these funds there is nothing to prevent the Secretary of the Interior from using them in his discretion, and especially from using them as the real owners thereof desire and request.

"16. Prior to 1900 the sectarian schools were aided by appropriations from the public moneys, and in the discretion of the Secretary of the Interior, from the tribal funds just described.

"In 1900, not only the public appropriations ceased, as has been heretofore shown, but all aid from the tribal funds also ceased, except as to the Osage Treaty and trust funds hereinbefore referred to. At the request of the Osage Indians, their treaty funds have been annually and uninterruptedly applied to the Catholic mission schools under annual contract with the Commissioner of Indian Affairs, approved by the Secretary of the In-

The case was submitted on record and briefs, and the court affirmed the decree below in respect of the income of the "Trust Fund," and reversed the injunction against the payment from the "Treaty Fund," and remanded the case with directions to dismiss the bill at the cost of the complainants, whereupon the case was brought to this court on appeal.

terior. With the exception of the Osage funds, no 'Tribal Funds' were applied to education in denominational schools from 1900 to 1904.

"In the meantime application was made to President McKinley by the 'Bureau of Catholic Indian Missions' for the revocation of the 'Browning Ruling' and the use of 'Tribal Funds' for the education of the Catholic Indian children in Catholic schools.

"On September 30, 1896, the then Commissioner of Indian Affairs, D. M. Browning, in answer to the question, 'whether parents of Indian children have the right to decide where their children shall attend school,' said:

"'It is your duty first to build up and maintain the Government day schools, as indicated in your letter, and the Indian parents have no right to designate which school their children shall attend.'

"This was the 'Browning ruling.' It was ordered abrogated by President McKinley in 1901, and some eight months after, to wit, January 17, 1902, it was formally abrogated by the Commissioner of Indian Affairs with the approval of the Secretary of the Interior.

"The question of the use of the 'Tribal Funds' was referred by President McKinley to the Secretary of the Interior, and by him to the Commissioner of Indian Affairs, who decided adversely to the appropriation on February 12, 1901.

"17. On or about January 1, 1904, the matter of the application for the use of 'Tribal Funds' for the education of Indian children in Mission Schools was brought to the attention of President Roosevelt by the 'Bureau of Catholic Indian Missions,' who urged that the Indians should be allowed to use their own money in educating their own children in the schools of their choice.

"President Roosevelt took up the matter on January 22, 1904, at a meeting in the executive office of the White House, at which were present the Attorney General (Mr. Knox) and Mr. Russell, of the Department of Justice, and Secretaries Hitchcock, Cortelyou and Wilson, and Postmaster General Payne. The President was legally advised that, notwithstanding the declaration of Congressional intent not to make appropriations in the future of public moneys of the American people for sectarian institutions, the previous laws giving the Secretary of the Interior discretion to use certain moneys of the Indians held in trust in any way that he might see fit, including assistance to sectarian schools, were not repealed, and consequently his discretion remained.

"The President decided that inasmuch as the legal authority existed to

*Mr. Charles C. Binney* and *Mr. Hampton L. Carson,* with whom *Mr. N. Dubois Miller* was on the brief, for appellants:

The term "contract schools," used in the Indian Appropriation Act for the fiscal year 1895, directing an investigation, and in the similar acts for the years 1896–1900, inclusive, imposing gradually increasing limitations upon the Secretary of

---

grant the request of the Indians, they were entitled as a matter of moral right to have the moneys coming to them used for the education of their children at the schools of their choice.

"A full and detailed statement of the action of the President in 1904 is set forth in his letter of February 3, 1905, which, with its enclosure, is herein set out at length:

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

" 'This new request was submitted to the Department of Justice, and the department decided, as set forth in the accompanying report, that the prohibition of the law as to the use of public moneys for sectarian schools did not extend to moneys belonging to the Indians themselves, and not to the public, and that these moneys belonging to the Indians themselves might be applied in accordance with the desire of the Indians for the support of the schools to which they were sending their children. There was, in my judgment, no question that, inasmuch as the legal authority existed to grant the request of the Indians, they were entitled as a matter of moral right to have the moneys coming to them used for the education of their children at the schools of their choice. Care must be taken, of course, to see that any petition by the Indians is genuine, and that the money appropriated for any given school represents only the *pro rata* proportion to which the Indians making the petition are entitled. But if these two conditions are fulfilled, it is, in my opinion, just and right that the Indians themselves should have their wishes respected when they request that their own money —not the money of the public—be applied to the support of certain schools to which they desire to send their children. The practice will be continued by the department unless Congress should decree to the contrary, or, of course, unless the courts should decide that the decision of the Department of Justice is erroneous.'

"This communication enclosed a letter from the Attorney General setting forth at length the grounds for the conclusion 'that, notwithstanding the declaration of Congressional intent not to make appropriations in the future of public moneys of the American people for sectarian institutions, the previous laws giving the Secretary of the Interior discretion to use certain moneys of the Indians held in trust in any way that he might see fit, including assistance to sectarian schools, were not repealed, and consequently his discretion remained. For some of these laws, see 14 Stat. 687; 16 Stat. 362; 21 Stat. 292; 22 Stat. 30; 25 Stat. 895; 26 Stat. 146; *id.* 344.'

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

the Interior's power to contract, included the schools for which the contracts were then payable out of Indian treaty and trust funds.

When Congress in 1894 directed the Secretary of the In-

"Accordingly the following contracts were made by the United States with various sectarian organizations for the education of Indian children from 'Tribal Funds' for the fiscal year ending June 30, 1906:

| Name of School. | Denomination. | Pupils. | Tribe. | Rate per annum. | Total per year. |
|---|---|---|---|---|---|
| St. Joseph . . . . . . . . . . . . . . | Catholic . . . . | 170 | Menominee . . . . | $108 | $18,360 |
| St. Louis . . . . . . . . . . . . . . . | Catholic . . . . | 75 | Osage . . . . . . . . | 125 | 9,375 |
| St. John . . . . . . . . . . . . . . . | Catholic . . . . | 65 | Osage . . . . . . . . | 125 | 8,125 |
| Immaculate Conception . . . . | Catholic . . . . | 65 | Sioux . . . . . . . . | 108 | 7,020 |
| Holy Rosary . . . . . . . . . . . . | Catholic . . . . | 200 | Sioux . . . . . . . . | 108 | 21,600 |
| St. Francis . . . . . . . . . . . . . | Catholic . . . . | 250 | Sioux . . . . . . . . | 108 | 27,000 |
| St. Labre . . . . . . . . . . . . . . | Catholic . . . . | 60 | Northern Cheyenne. | 108 | 6,480 |
| St. Mary . . . . . . . . . . . . . . . | Catholic . . . . | 10 | Quapaw . . . . . . | 50 | 500 |
| Zoas' Boarding School . . . . . | Lutheran . . . | 40 | Menominee . . . . | 108 | 4,320 |
| Total . . . . . . . . . . . . . | . . . . . . . . . . . | 935 | . . . . . . . . . . . . . . | . . . . . . . . | $102,780 |

"In June, 1905, the Commissioner of Indian Affairs was notified by the 'Bureau of Catholic Indian Missions' that it was prepared to care for and educate during the fiscal year ending June 30, 1906, Indian pupils at the several schools carried on by it among the Sioux, Menominee, Osage, Northern Cheyenne, and Quapaw tribes upon the same terms and conditions as stipulated in its contracts for carrying on these schools for the fiscal year 1905, and requested that it be granted a renewal of the contracts in question, payable in each case from the trust and treaty funds of the tribe among which the school is located for the twelve months beginning July 1, 1905.

"To this application the Commissioner replied that the request would receive careful consideration; that the applicability of the trust and treaty funds had been submitted to the proper authorities for a definite determination, and indicated how petitions should be prepared, and the safeguards under which the signatures of the Indians should be made. Petitions were duly filed, signed under all the safeguards, by the Catholic Indians.

"In the meantime the schools were opened at the usual time and instruction given to the required number of pupils, in the confidence that the contracts applied for would be renewed.

"The Attorney General not having rendered any decision in the matter, the President, by a letter dated December 23, 1905, addressed to the Commissioner of Indian Affairs, after quoting a part of his letter of February 3, 1905, hereinbefore referred to, said:

"'There are two kinds of Indian funds involved in this matter. One is the trust fund, which requires no appropriation by Congress, and which clearly is to be administered as the Indians themselves request. As regards this fund, you will treat it on the assumption that the Indians have the right to say how it shall be used, so far as choosing the schools to which

terior "to inquire into and investigate the propriety of discontinuing contract schools and whether, in his judgment, the same can be done without detriment to the education of Indian children, and that he submit to Congress, at the next

their children are to go is concerned; and each Indian in a tribe to be credited with his *pro rata* share of the funds which you will apply for him to the Government school where that is the school used, or to the church school where that is the school used, instead of segregating any portion of the fund for the support of the Government school and prorating the balance.

" 'The other fund consists of moneys appropriated by Congress in pursuance of treaty stipulations. As to these moneys it is uncertain as to whether or not the prohibition by Congress of their application for contract school applies—that is, whether or not we have the power legally to use these moneys as we clearly have the power to use the trust funds. It appears that certain of the contract schools are now being run in the belief that my letter quoted above authorized the use of the treaty funds. It would be a great hardship, in the absence of any clearly defined law on the subject, to cut them off at this time arbitrarily, and inasmuch as there is a serious question involved, I direct that until the close of the fiscal year these schools be paid for their services out of the moneys appropriated by Congress in pursuance of treaty obligations, on the same basis as the schools paid out of the trust funds—always exercising the precautions directed in my letter of February 3d, 1905, 'to see that any petition by the Indians is genuine, and that the money appropriated for any given school represents only the *pro rata* proportion to which the Indians making the petition are entitled.' But no new contracts are to be entered into for such payments after the close of the present fiscal year, unless there is authorization by Congress or some determination by the courts.'

"Accordingly, the contracts for the fiscal year ending June 30, 1905, hereinafter set forth, were renewed for the fiscal year ending June 30, 1906, the new contracts being executed as of July 1, 1905.

"The services have been performed under all these contracts and the money paid in all of them, except under the contract with the 'Bureau of Catholic Indian Missions' for the education of 250 Indian pupils at St. Francis Mission School on the Rosebud Reservation. The payment of the $27,000 which is due under this contract has been withheld pending the decision by this honorable court as to validity of the contract and the appropriation of tribal funds for such purposes.

"18. And these defendants, specifically answering as to the contract in dispute, say:

"That it is a contract made between F. E. Leupp, Commissioner of Indian Affairs, for and on behalf of the United States of America, and the 'Bureau of Catholic Indian Missions,' executed as of July 1, 1905, for the care, education and maintenance of 250 Indian pupils at the St. Francis Mission School, Rosebud Reservation, South Dakota, at $108 per capita,

session, the result of such investigation, including an estimate of the annual cost, if any, of substituting Government schools for contract schools," and when the Secretary reported, suggesting a plan for gradually doing away with the contract schools, making no distinctions among them, both Congress and the Secretary referred to the contract schools in general, and not merely to those of them which were supported from the appropriations expressly made by Congress for Indian education, to the exclusion of the contract schools supported from Indian treaty and trust funds.

After the close of the fiscal year 1900 the Secretary of the Interior could not legally make or authorize any contract, in behalf of the United States, for the education of Indian pupils in any sectarian school.

Considering the direction to the Secretary of the Interior in 1894 to investigate the propriety of discontinuing contract schools, and to report the cost of substituting Government schools for contract schools; his report advocating a gradual reduction in the contract schools during a short period of years, during which period the Government should prepare to do without them; the adoption of the system advocated by him, successively restricting more and more his authority to con-

per annum, amounting to $27,000. The contract was approved by Jesse E. Wilson, Acting Secretary of the Interior.

"Application for the contract was made by the 'Bureau of Catholic Indian Missions' on June 6, 1905.

"On March 26, 1906, a petition duly signed and genuinely signed by 212 members of the Sioux tribe of Indians of the Rosebud Agency, South Dakota, was filed, asking that the said contract applied for be entered into with the bureau.

"The payments under the contract were to be made from the 'Sioux Trust Fund' and the 'Sioux Treaty Fund,' as hereinbefore described, in the discretion of the Commissioner of Indian Affairs.

"There are 4,986 Indians on the rolls of the Rosebud Reservation, and the amount of tribal income applicable to education, in the discretion of the Commissioner, is—

"$250,047.90, or a per capita of $50.15.

"The 212 petitioners represent 669 shares, or $33,550.35, and of this they ask that $27,000 be used for the education of their children in St. Fran-

tract with such schools; the declarations in the acts of 1896 and 1897 that, subject to the restricted authority granted by those acts, it was "the settled policy of the Government to hereafter make no appropriation whatever for education in any sectarian school"; the declaration in the act of 1899 that the appropriation there made was "the final appropriation for sectarian schools"; and the fact that since 1899 no statute has granted the Secretary any authority to contract with sectarian schools for the education of Indian pupils; the conclusion is irresistible that Congress decided to abolish the entire system of Government aid to such schools, and to do so by depriving the Secretary of all authority to make any more such contracts.

Moreover, as it has been shown above that the term "contract schools" was officially used as including contract schools supported from Indian treaty and trust funds, the conclusion is irresistible that Congress made no distinction between contracts as to which the money was to come from the appropria-

---

cis Mission School. The following table will represent the *pro rata* shares in these tribal funds, and the per capita shares:

| | | |
|---|---|---|
| 4,986 | Indians, | $250,047.90 Tribal Funds $50.15 per capita. |
| 669 | shares | |
| | Petitions, | 33,550.35 Tribal Funds $50.15 per capita. |
| 4,317 | Petitions (non-petitions) | |
| 4,986 | | $250,047.90 Tribal Funds $50.15 per capita. |

"The cost of the Government school for the fiscal year was about $76,830. Since the shares of the petitioning Indians amount to $33,550.35, and the sum asked for the school is only $27,000 out of this share, and the petitions were genuinely signed, the terms of the executive order of President Roosevelt of February 3d, 1905, *e. g.,* 'to see that any petition by the Indians is genuine, and that the money appropriated for any given school represents only the *pro rata* proportion to which the Indians making the petition are entitled,' have been strictly carried out.

"The services under this contract have been fully performed to the satisfaction of the Commissioner of Indian Affairs, and the twenty-seven thousand dollars ($27,000) agreed to be paid is due and payable, if this honorable court determines that it is legally payable out of the 'Sioux Trust Fund' and the 'Sioux Treaty Fund.'"

\*          \*          \*          \*          \*          \*          \*          \*          \*          \*

tion for the support of schools, and contracts as to which the money was to come from Indian treaty and trust funds.  In either case the Government was the disburser of the money—the hand which directly dispensed the aid—and the money was disbursed under a contract.  To deprive the Secretary of the power to make such contracts altogether was the only effectual means of preventing him from using Indian treaty and trust funds for sectarian schools, and it would operate just as effectually in regard to such funds as in regard to funds derived from the appropriation for the support of schools.

The Secretary's power to make such a contract was taken away altogether, and not merely as regards contracts where the money was to be paid out of appropriations by Congress expressly for the support of Indian schools.

As regards the taking away of the Secretary's power to make such a contract, no distinction can be drawn between money expressly appropriated by Congress for the support of Indian schools and money appropriated by Congress in fulfillment of Indian treaties and available for education.

As regards use under contracts with sectarian schools, no distinction can be drawn between money expressly appropriated by Congress for the support of Indian schools and money paid by the Government as interest on Indian funds held in trust by it.

While in the case of the Sioux trust fund the appropriation is made by a different system from that pursued with the Sioux treaty fund, there is still an appropriation within the meaning of the acts of 1896 and 1897, declaring it to be "the settled policy of the Government to hereafter make no appropriation whatever for education in any sectarian school," and the act of 1899 which said, "this being the final appropriation for sectarian schools."  The word "appropriation," used as it is here, in statutes of the class known as "appropriation acts," is necessarily technical.  It means an appropriation by Congress of money in the Treasury of the United States.  Restricted as this meaning is, however, the whole phrase,

"make no appropriation whatever," is as broad a phrase as the limits of that meaning will possibly permit, and it refers to any and every kind of appropriation that Congress can make, without regard to the method of such appropriation. "No appropriation *whatever*" is a phrase that can have no limits but those which necessarily restrict the word "appropriation" itself.

The appropriations of funds in the United States Treasury are of two kinds, viz., those made for each successive fiscal year, and permanent annual appropriations. The latter are provided for in §§ 3687–3689, Rev. Stat., and cover a number of matters (the cost of revenue collection, payment of interest on the public debt, etc.), which are expected to recur every year, either indefinitely or for a considerable period, so that it is held inadvisable to make a special appropriation for them every year. When the Revised Statutes were compiled, the Indian trust funds were all invested (under §§ 2095, 2096), and the income received was paid to the Indians or expended for them, and this system was not changed until the act of April 1, 1880, c. 41, 21 Stats. 70. That act, providing for the payment of interest upon Indian trust funds deposited in the Treasury to the credit of Indian tribes, such payment to "be made in the usual manner, as each may become due, without further appropriation by Congress," really constitutes a permanent annual appropriation of such interest. Had that change been made before the Revised Statutes were compiled, the interest on the Indian trust funds would presumably have been included in the permanent annual appropriation system. The words "*without further* appropriation by Congress" clearly show that the provision of the act of 1880 constituted an appropriation once for all, or in other words a permanent annual appropriation.

*The Solicitor General* and *Mr. Edgar H. Gans*, with whom *The Attorney General* was on the brief, for appellees:

There is no constitutional question. For eighty years Con-

gress extended aid out of the public funds to mission schools of various denominations, finally withdrawing it because of opposition among the people at large and because the time had thus arrived for establishing distinctive government schools. If there were a valid constitutional objection to the earlier course, it is probable that it would have been discovered during that period of eighty years. The Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." A religious establishment, however, is not synonymous with an establishment of religion. See *Bradfield* v. *Roberts*, 175 U. S. 291, upholding an appropriation for a Roman Catholic hospital. A school, like a hospital, is neither an establishment of religion nor a religious establishment, although along with secular education there might be, as there commonly is, instruction in morality and religion, just as in a hospital there would be religious ministrations.

But opposing counsel advance a line of suggestion similar to that made by the complainant in *Bradfield* v. *Roberts*, viz.: that the contract involved a principle and a precedent contrary to the Article of the Constitution, and tended to obliterate the essential distinction between civil and religious functions and injured the complainant and all other citizens and taxpayers of the United States, and was contrary to the Constitution and declared policy of the Government. But the court passed all such contentions, merely referring to them as statements of complainant's opinion.

The question here is wholly of statutory construction. The aid of the public funds was gradually diminished and then wholly withdrawn with the declaration in the acts of 1896 and 1897 that thereafter the policy of the Government would be to make no appropriation for sectarian schools, and the reference to the appropriation of 1899 as final, 29 Stat. 345; 30 Stat. 79 and 942. These declarations of policy would not prevent the present or a future Congress from resuming the appropriation and renewing the aid. The pro

hibition must be restricted to the particular kind of appropriations in which the declaration of policy appears, namely, to those under the heading "Support of Schools" which are altogether appropriations of public funds for Indian education; it is not intended to apply to the "tribal funds," as contended by the appellants, which are dealt with in an entirely different and separated portion of the appropriation acts. It is a case where the proviso or exception relates only to the particular paragraph or distinct portion of the statute where it occurs, and is not to be extended to the whole statute or other portions of it. *Savings Bank* v. *Collector*, 3 Wall. 495; *Henderson's Tobacco*, 11 Wall. 658; *Dollar Savings Bank* v. *United States*, 19 Wall. 227.

The "treaty funds" are manifestly funds belonging to the Indians, just as much in the case of the treaty funds which are the annual payment by installment of obligations to the Indians incurred under treaties, as with the trust funds which are the lump sums paid in settlement of such obligations, upon which the income is expended for the benefit of the Indians. In each case there is an "appropriation," annual or permanent, made, not as the ordinary appropriation applying public funds, but simply as an authority or mandate to the executive agents and the trustee to apply the avails of the fund as usual every year for the benefit of the *cestui que trust.*

There is no injustice in permitting an Indian to select a school for his children under the auspices of the church to which he is attached, and allowing on that account a portion of the tribal funds or a portion of the annuities or rations to be applied. Why should not one Indian or a group of Indians benefit by their strict proportionate share of the tribal funds and be permitted to determine, always within the scope of the Secretary's discretion, how their proportion of the funds should be expended? It is significant that Congress has refused to direct otherwise, laying on the table a bill forbidding trust and treaty funds to be so applied (H. R. 7067, 59th Cong., 1st sess.).

As to the related point that payments out of the treaty fund will diminish the amount of money which should be expended for the benefit of the entire tribe, the fact is that while the money arising from such funds is not systematically distributed *per capita*, it is nevertheless expended for *the benefit and advantage* of the Indians under a liberal exercise of the Secretary's discretion. The Indian may have no individual *locus standi* to compel payment in hand to him, but that does not prohibit the Secretary from applying a proper share of the funds for his individual benefit, especially when the Secretary's discretion is exercised by giving the same benefit to a collective group of individual Indians. That the treaty funds are intended by the law to provide for the Indians as individuals is evident from the heading "Subsistence and Civilization," under which the appropriation acts go on to provide for fulfilling treaty obligations, and from the long established practice of distributing food and clothing out of treaty funds. An examination of examples of such funds in the treaties and statutes shows that the entire application of the proceeds of such tribal funds is committed to the Secretary's discretion with little limitation. Treaty of 1848, art. 5, 9 Stat. 952; treaty of 1865, art. 2, 14 Stat. 687; act July 15, 1870, c. 296, 16 Stat. 362; act June 16, c. 252, 21 Stat. 292; act March 22, 1882, c. 46, 22 Stat. 30; act June 12, 1890, c. 418, 26 Stat. 146. In short, it is evident that while in a certain sense these funds and their revenue are to be administered for the benefit of the tribe, the aggregate community, the determination of that matter also is committed to the Secretary, and he is plainly authorized to administer the funds proportionately for the benefit of smaller groups or of individuals and in the way of benefiting them with any educational or civilizing influence.

It would be unjust to withhold from an Indian or community of Indians the right, within reasonable limits, in good faith, and under the safeguards provided by the President's instructions, to choose their own school and to choose it frankly because the education therein is under the influence of the

religious faith in which they believe and to which they are attached, and to have the use of their proportion of tribal funds applied under the control of the Secretary's discretion to maintain such schools. Any other view of the case perverts the supposed general spirit of the constitutional provision into a means of prohibiting the free exercise of religion.

Mr. CHIEF JUSTICE FULLER, after making the foregoing statement, delivered the opinion of the court.

We concur in the decree of the Court of Appeals of the District and the reasoning by which its conclusion is supported, as set forth in the opinion of Wright, J., speaking for the court. Washington Law Rep., v. 35, p. 766.

The validity of the contract for $27,000 is attacked on the ground that all contracts for sectarian education among the Indians are forbidden by certain provisos contained in the Indian Appropriation Acts of 1895, 1896, 1897, 1898 and 1899. But if those provisos relate only to the appropriations made by the Government out of the public moneys of the United States raised by taxation from persons of all creeds and faiths, or none at all, and appropriated gratuitously for the purpose of education among the Indians, and not to "Tribal Funds," which belong to the Indians themselves, then the contract must be sustained. The difference between one class of appropriations and the other has long been recognized in the annual appropriation acts. The gratuitous appropriation of public moneys for the purpose of Indian education has always been made under the heading "Support of Schools," whilst the appropriation of the "Treaty Fund" has always been under the heading "Fulfilling Treaty Stipulations and Support of Indian Tribes," and that from the "Trust Fund" is not in the Indian Appropriation Acts at all. One class of appropriations relates to public moneys belonging to the Government; the other to moneys which belong to the Indians and which is administered for them by the Government.

From the history of appropriations of public moneys for education of Indians, set forth in the brief of counsel for appellees and again at length in the answer, it appears that before 1895 the Government for a number of years had made contracts for sectarian schools for the education of the Indians, and the money due on these contracts was paid, in the discretion of the Commissioner of Indian Affairs, from the "Tribal Funds" and from the gratuitous public appropriations. But in 1894 opposition developed against appropriating public moneys for sectarian education. Accordingly, in the Indian Appropriation Act of 1894, under the heading of "Support of Schools," the Secretary of the Interior was directed to investigate the propriety of discontinuing contract schools and to make such recommendations as he might deem proper. The Secretary suggested a gradual reduction in the public appropriations on account of the money which had been invested in these schools, with the approbation of the Government. He said: "It would be scarcely just to abolish them entirely—to abandon instantly a policy so long recognized," and suggested that they should be decreased at the rate of not less than twenty per cent a year. Thus in a few years they would cease to exist, and during this time the bureau would be gradually prepared to do without them, while they might gather strength to continue without Government aid.

Accordingly Congress introduced in the appropriation act of 1895 a limitation on the use of public moneys in sectarian schools. This act appropriated under the heading "Support of Schools" "for the support of Indian and industrial schools and for other purposes . . . . $1,164,350, . . . provided, that the Secretary of the Interior shall make contracts, but only with the present contract schools for the education of Indian pupils during the fiscal year ending June 30, 1896, to an extent not exceeding eighty per cent of the amount so used in the fiscal year 1895, and the Government shall as early as practicable make provision for the education of the Indians in Government schools."

This limitation of eighty per cent was to be expended for contract schools, which were those that up to that time had educated Indians through the use of public moneys, and had no relation and did not refer to "Tribal Funds."

In the appropriation act of 1896, under the same heading, "Support of Schools," the appropriation of public money of $1,235,000 was limited by a proviso that contracts should only be made at places where non-sectarian schools cannot be provided for Indian children to an amount not exceeding fifty per cent of the amount so used for the fiscal year 1895, and immediately following the appropriation of public money appears the expression, "and it is hereby declared to be the settled policy of the Government to hereafter make no appropriation whatever for education in any sectarian school." This limitation, if it can be given effect as such, manifestly applies to the use of public moneys gratuitously appropriated for such purpose, and not to moneys belonging to the Indians themselves. In the appropriation act of 1897 the same declaration of policy occurs as a limitation on the appropriation of public moneys for the support of schools, and the amount applicable to contract schools was limited to forty per cent of the amount used in 1895. In the act of 1898 the amount applicable to contract schools was limited to thirty per cent, and in the act of 1899 the amount so applicable was limited to fifteen per cent, these words being added: "this being the final appropriation for sectarian schools." The declaration of the settled policy of the Government is found only in the acts of 1896 and 1897, and was entirely carried out by the reductions provided for.

Since 1899 public moneys are appropriated under the heading "Support of Schools" "for the support of Indian and industrial schools and for other educational purposes," without saying anything about sectarian schools. This was not needed, as the effect of the legislation was to make subsequent appropriations for education mean that sectarian schools were excluded in sharing in them, unless otherwise provided.

As has been shown, in 1868 the United States made a treaty with the Sioux Indians, under which the Indians made large cessions of land and other rights. In consideration of this the United States agreed that for every thirty children a house should be provided and a teacher competent to teach the elementary branches of our English education should be furnished for twenty years. In 1877, in consideration of further land cessions, the United States agreed to furnish all necessary aid to assist the Indians in the work of civilization and furnish them schools and instruction in mechanical and agricultural arts, as provided by the Treaty of 1868. In 1889 Congress extended the obligation of the treaty for twenty years, subject to such modifications as Congress should deem most effective, to secure the Indians equivalent benefits of such education. Thereafter, in every annual Indian appropriation act, there was an appropriation to carry out the terms of this treaty, under the heading "Fulfilling Treaty Stipulations with and Support of Indian Tribes."

These appropriations rested on different grounds from the gratuitous appropriations of public moneys under the heading "Support of Schools." The two subjects were separately treated in each act, and, naturally, as they are essentially different in character. One is the gratuitous appropriation of public moneys for the purpose of Indian education, but the "Treaty Fund" is not public money in this sense. It is the Indians' money, or at least is dealt with by the Government as if it belonged to them, as morally it does. It differs from the "Trust Fund" in this: The "Trust Fund" has been set aside for the Indians and the income expended for their benefit, which expenditure required no annual appropriation. The whole amount due the Indians for certain land cessions was appropriated in one lump sum by the act of 1889, 25 Stat. 888, chap. 405. This "Trust Fund" is held for the Indians and not distributed *per capita*, being held as property in common. The money is distributed in accordance with the discretion of the Secretary of the Interior, but really belongs to

the Indians. The President declared it to be the moral right of the Indians to have this "Trust Fund" applied to the education of the Indians in the schools of their choice, and the same view was entertained by the Supreme Court of the District of Columbia and the Court of Appeals of the District. But the "Treaty Fund" has exactly the same characteristics. They are moneys belonging really to the Indians. They are the price of land ceded by the Indians to the Government. The only difference is that in the "Treaty Fund" the debt to the Indians created and secured by the treaty is paid by annual appropriations. They are not gratuitous appropriations of public moneys, but the payment, as we repeat, of a treaty debt in installments. We perceive no justification for applying the proviso or declaration of policy to the payment of treaty obligations, the two things being distinct and different in nature and having no relation to each other, except that both are technically appropriations.

Some reference is made to the Constitution, in respect to this contract with the Bureau of Catholic Indian Missions. It is not contended that it is unconstitutional, and it could not be. *Roberts* v. *Bradfield*, 12 App. D. C. 475; *Bradfield* v. *Roberts*, 175 U. S. 291. But it is contended that the spirit of the Constitution requires that the declaration of policy that the Government "shall make no appropriation whatever for education in any sectarian schools" should be treated as applicable, on the ground that the actions of the United States were to always be undenominational, and that, therefore, the Government can never act in a sectarian capacity, either in the use of its own funds or in that of the funds of others, in respect of which it is a trustee; hence that even the Sioux trust fund cannot be applied for education in Catholic schools, even though the owners of the fund so desire it. But we cannot concede the proposition that Indians cannot be allowed to use their own money to educate their children in the schools of their own choice because the Government is necessarily undenominational, as it cannot make any law respecting an

establishment of religion or prohibiting the free exercise thereof. The Court of Appeals well said:

"The 'Treaty' and 'Trust' moneys are the only moneys that the Indians can lay claim to as matter of right; the only sums on which they are entitled to rely as theirs for education; and while these moneys are not delivered to them in hand, yet the money must not only be provided, but be expended, for their benefit and in part for their education; it seems inconceivable that Congress should have intended to prohibit them from receiving religious education at their own cost if they so desired it; such an intent would be one 'to prohibit the free exercise of religion' amongst the Indians, and such would be the effect of the construction for which the complainants contend."

The *cestuis que trust* cannot be deprived of their rights by the trustee in the exercise of power implied.

*Decree affirmed.*