Conversion Center Charter Case.

240

Argued January 8, 1957. Before Jones, C. J., Bell, Chidsey, Musmanno, Arnold, Jones and Cohen, JJ.

*Robert C. Grasberger,* with him *Read Rocap, Jr.,* and *Rocap & Rocap,* for appellants.

No argument was made nor brief submitted for appellee.

OPINION BY MR. JUSTICE CHIDSEY, March 25, 1957:

This appeal is from the order of the court below refusing to grant a charter under the provisions of the Nonprofit Corporation Law of May 5, 1933, P. L. 289, as amended, 15 PS §2851 et seq., to a proposed corporation of the second class, to be known as The Conversion Center, Inc.

Article II, §201 of the Act provides: "Five or more natural persons of full age and of either sex, married or single, at least three of whom are residents of the Commonwealth and citizens of the United States, its territories or possessions, may form a nonprofit corporation under the provisions of this act *for any purpose or purposes which are lawful and not injurious to the community.*". (Emphasis supplied).

Appellants qualified as incorporators under the foregoing section and complied with all procedural requirements of the Act in the presentation of their application for the charter. The pertinent portion of Article II, §207 of the Act is as follows: ". . . The court shall consider the application. It may hear evidence, if any there be, on behalf of the applicants and against the application, or it may refer the application to a master to make report as to the propriety of granting the application. In such case, upon the filing of the master's report, the court shall grant the applicants and protestants a hearing, if exceptions are filed by either of them. If the court shall find the articles to be in proper form and within the provisions of this act,

*and the purpose or purposes given in the articles to be
lawful and not injurious to the community, the court
shall so certify on the articles,* and *shall* order and de-
cree thereon that the articles are approved and that,
upon the recording of the articles and the order, the
corporation shall come into existence for the purpose
or purposes and upon the terms stated therein; other-
wise, the court shall refuse the application for a char-
ter.". (Emphasis supplied).

The court heard testimony without reference to a
master. The purpose of the formation of the corpora-
tion as set forth in the articles of incorporation is as
follows: "THIRD: The purpose of this corporation shall
be to promote the Gospel of Our Lord and Savior,
Jesus Christ; to foster, promote and encourage under-
standing and good will among members of all religious
faiths, and to discourage the use of violence, boycotts
and sanctions by adherents of one religion against ad-
herents of another by holding religious meetings and
conferences; by radio and television broadcasting; by
the imprinting of Gospel messages on records and
transcriptions; by producing and distributing Gospel
motion pictures; by printing and publishing religious
literature; by employing and contributing to the sup-
port of missionaries; by conducting forums and in-
struction classes; by operating a library, and by con-
ducting such other activities as promote the said pur-
pose.

"This corporation will place particular emphasis on
the evangelization and conversion of adherents of the
Roman Catholic faith, providing spiritual, temporal
and financial assistance, especially to their converted
clergy.

"This is to be a nonprofit corporation and does not
contemplate pecuniary gain incidental, or otherwise,
to its members.".

The function of the court was to satisfy itself that the purposes set forth in the proposed articles are "lawful and not injurious to the community". This was recognized by the court below in its opinion when it stated: "We agree with counsel for the applicants that the sole question to be decided by this court is whether or not the purposes set forth in the proposed Articles of Incorporation are lawful and not injurious to the Community.". However, in its opinion denying the application the court stated its reasons to be that to grant the charter ". . . would in effect place the blanket of approval of this court on such activity.", and ". . . might well lead to a condition of unrest in the community . . .". Both of these reasons were predicated upon the second paragraph of the purpose clause which stated that the corporation would place particular emphasis on the evangelization and conversion of adherents of the Roman Catholic faith, providing spiritual, temporal and financial assistance, especially to their converted clergy.

It may be immediately observed that whether the court, because of personal predilection on the subject, does not wish it to appear that it approves of the purposes of the corporation is beside the point. As stated in *Deutsch-Amerikanischer Volksfest-Verein,* 200 Pa. 143, 49 A. 949, at p. 145: "The privilege of incorporation, and the requirements to obtain it, are wholly statutory. The courts are not entitled to grant or refuse the right except upon legal grounds, and the requirements fixed by law can neither be dispensed with, nor added to. . . .".

The court does not state that the purposes of the incorporators are unlawful or injurious to the public. Indeed to the contrary it states that it agrees ". . . that the privilege of one religious group to proselyte among members of other religious or non-religious groups, to

win converts to its religious beliefs, stand inviolate under the law and cannot and should not be impinged by any restriction or limitation statutory or otherwise. . . .". It also indicated at the hearings and in its opinion that it would approve the charter if the second paragraph of the purposes set forth in the application therefor were deleted, and that the incorporators would lose nothing by its exclusion,[1] thus expressing the view that the incorporators could direct the preaching of their beliefs and conversion activities toward any or all sects or faiths, free to direct their activity toward any particular one. The court's position in effect was that the proposed incorporation could concentrate its efforts toward the conversion of adherents of the Roman Catholic Church but that it should not say so in its charter. Certainly a true and frank statement of the purposes of incorporation is desirable and contemplated by the Act of Assembly. Charters will be refused where the real or ultimate purpose of incorporation is not disclosed in its articles of incorporation and is found to be an unlawful one.

It appeared from the testimony taken and the statement of counsel for the applicants that the incorporators wanted to be "straightforward" and "honest with the public" in declaring that emphasis would be placed upon the conversion of adherents to the Roman Catholic faith, and also set forth this particular objective for the information and protection of those contributing to the corporation's support, presently and in the future.

---

[1] In its opinion the court states: ". . . such exclusion does not take away any privileges of proselyting the corporate members might desire to indulge in, either among Roman Catholics and their Priesthood or any other group now existing or to come into existence.".

Neither in the court below nor in this Court did anyone appear in opposition to the grant of the charter. The testimony at the hearings was adduced by counsel for the applicants and, quite properly, by many questions asked by the learned court. The latter questioning included an inquiry as to the necessity of the incorporation. While in our opinion a sufficient answer to this inquiry was given, if the purposes are lawful and not injurious to the public, the absence of necessity for a charter of incorporation is not a valid reason for refusing its grant: *Deutsch-Amerikanischer Volksfest-Verein,* supra.

It clearly appeared that the incorporators, who were not all of the same religious denomination, were reputable citizens. One of them was President of Kings College, Briarcliff Manor, New York, another a prominent real estate broker in Delaware and Philadelphia Counties and another a lay reader of the Episcopal Church. The court did not question the sincerity of any of them.

The 14th Amendment of the Constitution of the United States which incorporates the 1st Amendment, guarantees the free exercise of religion as does Article I, Section 3 of the Constitution of Pennsylvania. Not only is a citizen of this country entitled to the free expression of his religious beliefs, but he may by peaceful persuasion endeavor to convert others thereto, and we are aware of no bar to individuals organizing to effectuate their guaranteed rights in this regard. In *Minersville School District, Board of Education of Minersville School District et al. v. Gobitis et al.,* 310 U.S. 586, at p. 593 it is stated ". . . Government may not interfere with organized or individual expression of belief or disbelief. Propagation of belief—or even of disbelief—in the supernatural is protected, whether in Church or chapel, mosque or synagogue, tabernacle or

meeting-house. . . .". In *Cantwell v. Connecticut*, 310 U. S. 296 (1940), it was held that Jehovah's Witnesses, a well known religious sect, could proselyte on the street contrary to a city ordinance requiring a license to do so, even though their message could be regarded as insulting to the Protestant Church and to the Roman Catholic Church in particular.

It appears from the testimony at the hearings, which we have carefully read in its entirety, that many organizations exist for the purpose of converting members of one particular religious faith to another, amongst others St. Paul's Guild, incorporated in New York, whose primary purpose is the conversion of Protestant ministers to Catholicism. It also appears that, as stated in the first paragraph of the proposed Conversion Center, Inc., its work will be carried on peacefully and will discourage the use of violence, boycotts or sanctions. We cannot agree with the court below that the second paragraph set forth in the purpose clause of the charter is "repugnant" to the manner in which the incorporators propose to conduct their activities, as set forth in the first paragraph. The second paragraph merely states that it will particularly direct its activities toward adherents of the Roman Catholic faith and in no way contradicts the peaceful methods or means to be used in obtaining the proposed corporation's objectives.

The group applying for the charter had engaged in such activities, including the conversion of Roman Catholics, for some time prior to the making of its application for incorporation and there was no evidence that any "unrest" occurred "in the community" as the result thereof. The court's potential conclusion that the incorporation of the group "might" create "unrest" is not a sufficient reason for refusing the charter. In *Cantwell v. Connecticut*, supra, Mr. Justice ROBERTS,

speaking for an unanimous Court, at p. 310 said: "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.".

Nothing in the purpose clause of the proposed incorporation or in the evidence adduced at the hearings indicates that the activities of the corporation would consist of or include acts inimical to the peace, good order or morals of society, but quite clearly established the contrary. If the activities engendered reaction resulting in a breach of the peace, the sanctions of the law are available, for the State may safeguard the peace without unconstitutionally infringing upon the liberties protected by the Federal and State Constitutions. But an interdiction based on nothing more than the possibility of some future transgression of the law is a violation of the applicable constitutional guarantees.

For the reasons stated we are of the opinion that the purposes set forth in the appellants' articles of incorporation may not be declared unlawful or injurious to the public and therefore the charter should have been granted.

The order is reversed and the record remanded to the Court below with direction to grant the charter as applied for.

Dissenting Opinion by Mr. Justice Musmanno:

If there is one thing that the world needs less than anything else it is religious controversy; if there is one thing that the United States symbolizes more than any other thing it is religious freedom; if there is one thing that the judiciary of this country should frown upon, it is any attempt to obtain the approval of the Courts to stir up strife, discord, wrangling and violence over creed, dogma, and doctrine. Yet this Court is doing that very thing by ordering the Court of Common Pleas of Delaware County to grant a charter to an organization whose incorporators are intent on unleashing the winds of intolerance, the gales of prejudice, and the forces of hate and ignorance.

Five men in Delaware County petitioned the Court of Common Pleas for a first class charter for an organization to be known as the Conversion Center, Inc. The organization has two members in addition to the five incorporators. These seven men are launching a program to evangelize and convert "adherents of the Roman Catholic faith, providing, spiritual, temporal and financial assistance, especially to their converted clergy." They intend to carry on this program aggressively and militantly, with particular emphasis on inducing Catholic priests and nuns to break their vows and leave the church to which they have dedicated their souls, their lives, their fortunes, and their destinies. They intend to carry on this program under a charter bearing the seal of the Court of Common Pleas of Delaware County, but that Court has refused to be a party to the intolerant designs of the incorporators and has refused its seal. After an extended hearing in which all the incorporators (with the exception of Percy B. Crawford, who was absent) were heard, Judge Wm. R. Toal of the Court of Common Pleas of Delaware County declared in an excellently reasoned opinion that the pur-

ported program of the incorporators "might well lead to a condition of unrest in the community," and that, therefore, in the words of the Act of 1933, the purposes of the organization would be "injurious to the community."

The Majority of this Court find no reason for the alarm entertained by the hearing judge. They are satisfied that the activities of the corporation would not "consist of or include acts inimical to the peace, good order or morals of society." I have read the record and I do not reach so innocuous a conclusion. I have apprehensions that the decision of this Court, reversing the decision of the Court of Delaware County, will do grave harm to the general cause of peace, tranquillity and serenity of the community not only because the purposes of the organization may definitely lead to disorder, but because the militancy of the proposed organization will be waged in the name of Supreme Court approval.

No one, of course, with the slightest respect for the Constitution, would for a moment deny to the incorporators the right to make peaceful overtures to members of any organized religious organization to leave their church and join whatever organization the incorporators hold out as the salvation of the world. This right is guaranteed not only by the First Amendment to the Constitution of the United States, but even more specifically by Article I, Section 3 of our Pennsylvania Constitution which declares: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience and no preference shall be given

by law to any religious establishments or modes of worship."

However, it is to be noted that the very phraseology of this constitutional provision interdicts this Court from doing what it is about to do, for if government cannot interfere with the right of man to worship Almighty God according to the dictates of his own conscience, it certainly cannot authorize a corporation to interfere with that indefeasible right. The government cannot do indirectly what it may not do directly. The incorporators and members of the so-called Conversion Center, Inc., may persuade members of the Roman Catholic Church to stay away from their church, or even to disavow it, but they cannot do this in the name of the government; they cannot do this under the aegis of the Courts; they cannot do this under the flag of the United States. For government to authorize an organization or a group of individuals to solicit, persuade, or threaten members of any church to repudiate that church is a violation of the most basic principle of our whole American Commonwealth, namely, that the State and Church shall forever be separate.

By granting such an authorization the government would be entering a field in which it has no right to be whatsoever.

The seven men of the Conversion Center do not need the approval of any Court to set about proselyting Catholics. They may preach from the pulpit, they may orate from the platform, they may stand on street corners, they may knock at doors and endeavor by argument, rhetoric, words and pictures, to persuade others to leave the Roman Catholic Church, but, unless we are to demolish the sanctified wall between Church and State, they cannot do this in the name of the supreme power of the State.

The incorporators of the Conversion Center apparently doubted they had sufficient talents in the arts of persuasion to achieve the fulfillment of their proselyting desires, so they turned to the Court of Common Pleas of Delaware County to assist them in the realization of their plans. Judge TOAL of Delaware County was astonished at the request of these five men. Over and over he informed the incorporators and their attorney that they were seeking what no Court could give them—the authorization and the blessing of the law to invade the sacred precincts of another's conscience in worshipping God as he chooses.

I am similarly astonished that my colleagues see nothing wrong or strange about the request of these five men that they be authorized to proclaim to the world that their program of aggressive evangelization has the imprimatur of this Court.

There is no doubt in my mind that once the charter is granted, the organization will proclaim that the Supreme Court of Pennsylvania has approved of its purposes, not only as outlined in the charter application but as testified to and explained in extenso at the hearing. When Judge TOAL observed that the petitioners were seeking the authority of the law to "go out and convert Roman Catholics," Incorporator H. C. Dunlap agreed with him that this was "a matter of law."

Judge TOAL endeavored to convince the incorporators that it was enough for them to state, as they did in the first part of the third paragraph of their application: "The purpose of this corporation shall be to promote the Gospel of Our Lord and Savior, Jesus Christ; to foster, promote and encourage understanding and good will among members of all religious faiths, and to discourage the use of violence, boycotts, and

sanctions by adherents of one religion against adherents of another. . ."

Judge TOAL pointed out that if the incorporators were sincere in their declaration to "foster, promote and encourage understanding and good will among members of all religious faiths," there was no need to make specific mention of the Catholic faith. But the incorporators would not hear to this. They wanted the world to know that they were out to battle the Roman Catholic Church. They were prepared to print on their letterhead the legend: "Offering spiritual and temporal help to Roman Catholics." From their forthright declarations in Court it is quite evident that the quoted sentence is to be interpreted as: "Offering spiritual and temporal enmity to the Roman Catholic Church."

That the incorporators intend to be belligerent in their proselyting campaign was made very clear by Incorporator E. M. Houser who said that he would be willing to leave out the reference to the Catholic Church in the charter if it was definitely understood that they could carry on *aggressively* and *militantly* against Roman Catholics: "If we were permitted to carry on all of the functions of evangelicism *very aggressively, militantly,* use the words proselyte evangelicism, if you want, to Roman Catholics, it would not matter to me if it were in the corporate papers or not, if there was nothing to hinder us from—"*  At this point, Mr. Robert C. Grasberger, attorney for the incorporators, intervened, and, in his argument made the statement that if the Court did not allow the inclusion of the reference to the Catholic Church, this refusal "would be detrimental to the best interests of our country," whereupon the hearing Judge com-

---

* Italics throughout, mine.

mented: "you are talking through your hat when you say such a thing."

To grant a charter to the incorporators after the statements they made in open Court would be—if not an approval of the language they employed—at least an indication of judicial indifference to the expressions of blasphemy and reckless charges which came from their mouths. The images which these witnesses conjured up in their unbridled exhortations seemed in many ways pale specters rising up from the stagnant battlefields of the past—those battlefields which are encrusted with the dead blood, the savage hatreds, and the malignant ignorances of the so-called religious wars.

As I studied the record of this case I found myself wondering whether I was reading the chronicles of medieval feuds or the testimony of supposedly educated people in the Twentieth Century. Said Incorporator Albert Cameron: "when Stephen was dying, just before he died, Stephen beheld the glory of God, and he saw the Lord, Jesus Christ, standing at the right hand of God. That refutes any doctrine of the Roman Catholic." Cameron went on to assure the Court that *he* would be present with the Lord and he would see Him. "And that is what Roman Catholics should have, that and Jesus Christ alone. And if you really believe in Jesus Christ you won't be holding on those other things too."

Incorporator C. G. Watson said that he lived in Johnstown where 60% of the people are Roman Catholic, but that in his church which is undenominational, "we have approximately from twenty-five per cent to one-third Roman Catholic believers that have been won to Jesus Christ." The statement that Roman Catholics do not believe in Jesus Christ is a fair indication of the intellectual responsibility of this witness.

Mr. Watson also said that, according to "The Revelation, Chapters 2 and 3, that the church today particularly has failed." How the Revelation written 2,000 years ago, could speak of the status of the churches *today*, Mr. Watson did not specify.

Incorporator E. M. Houser testified: "I have seen Roman Catholic people, the same as unsaved Protestant people, need something, they need Jesus Christ; and of course as a minister of the gospel of Christ I administer Christ."

Rev. Houser stated that "part of the reason why we feel the church has failed" is "because Roman Catholics do not come to Protestant churches." Of course, Houser covers a great deal of territory when he says that "the church has failed." And then, just as a side line, Houser gave the Court his views on baptism. He said that baptism by immersion was fundamental, "but not essential to salvation. It is important, that is true, but we do not consider it essential to salvation. *We dip them and drop them.*"

A. Scott Dunlap, one of the two proposed members of the Conversion Center, was very emphatic about his views of the Roman Catholic Church, charging it with various faults, not excluding murder. He, however, did say that he did not believe in stoning Catholics or anybody. Everything that was to be done in the Conversion Center was to be done with *love*. Everything in the Conversion Center was to be accomplished with love, so long as the members of the organization could be aggressive and militant; only love was to permeate the activities of the Conversion Center so long as the incorporators and its members could charge the Roman Catholic Church with murder and other crimes; only love would guide the membership of the Conversion Center so long as its spokesmen could utter the most momentous and calumniating falsities. An idea of the

color of the mantle of love which would be worn by Mr. Dunlap's comrades in their aggressive and militant proselyting of Roman Catholics can be gathered from excerpts of letters which he introduced in evidence at the hearing before Judge TOAL:

"Count me as one to serve with you in this fight against the hideous monster we know as Roman Catholicism."

"I do praise God for your militant stand and exposure of Catholicism."

"There is no doubt that the Roman system is probably one of the greatest if not the greatest tools of Satan today. The Roman system certainly is a very real threat to the future freedom of our land."

"I shall pray that God will bless every effort you put forth to combat the great menace of Roman Catholicism."

"There are entirely too many pantywaist Christians who think the only way to win R.C.'s is to lovey-dovey them and lull them to the sleep of death with sermons that do not even begin to awaken them to their real and desperate need of Jesus Christ as Savior and Lord."

"I think that you have a real missionary field in this Catholic work; I feel that most of us are far too passive in our attitude toward people of this belief, and I am thankful for your positive passion and witness."

The testimony taken before Judge TOAL gives evidence of unrestrained fanaticism and wild-eyed planning. For example, it was testified that the Conversion Center has already obtained a house which is to be used, the incorporators explain, for the rehabilitation of priests and nuns who are to leave the Catholic Church. For this purpose the Conversion Center has provided kitchen facilities and sleeping facilities. In

a report of their success in this endeavor, it was testified that after sending out a million pieces of literature in their proselyting campaign, they have now in the house (with the kitchen and sleeping accommodations) "one converted priest from Colombia and an unconverted priest from Colombia." The Colombia referred to, of course, is the Colombia in South America, which would suggest that the seven aggressive men behind this spectacular enterprise intend to cover the six continents.

Of course, it is not necessary to repeat that these seven aggressive men have the right to make the weirdest of statements, no one can prevent them from entering into the most grotesque of preparations, no one can curtail them in uttering the most eccentric of claims, but they cannot do these things, which are bound eventually to create misunderstandings and disturbances in the communities in which they operate— they cannot run this bull of extravaganza through the china shop of society wearing a collar which is stamped: "Approved by the Supreme Court of Pennsylvania."

The Majority Opinion says that the incorporators are "reputable citizens." Without casting any reflection upon the character of the incorporators, it may be said that the pages of history are stained with the chronicles of acts of heart-shattering injustices accomplished by "reputable citizens." The killings of the so-called witches in Salem, Massachusetts, as well as in England up to the dawn of the Eighteenth Century were urged, instigated, and executed by "reputable citizens." The burning of Joan of Arc was done by "reputable citizens." The French Reign of Terror, with its emphasis on atheism, was headed by "reputable citizens." Many who manned the guillotine were "reputable citizens."

What is reputable citizenship? While it is a cloak of dignity which proclaims that its wearer is law-abiding and respectable, it does not conclusively guarantee that it may not conceal the bolo of intolerance and the falchion of fanaticism.

After vesting the incorporators with this cloak of respectability, the Majority confers the following vague accolade on three of them (unnamed): "One of them was President of Kings College, Briarcliff Manor, New York, another a prominent real estate broker in Delaware and Philadelphia Counties and another a lay reader of the Episcopal Church." I do not know what well of information was tapped by the Majority in obtaining the data above indicated, because *it does not appear in the record!* I presume that when the Majority spoke of the President of Kings College, it was referring to Percy B. Crawford who did not make a single appearance in Court so that the Court had no opportunity to see him and question him and therefore had no way of appraising his motives, intentions, and plans in connection with the organization under discussion. Nor does the record identify any of the incorporators as a "prominent real estate broker in Delaware and Philadelphia Counties." Who is he? The only reference in the record to a real estate broker was made by the incorporators' attorney, Robert C. Grasberger, who said that Alexander O. Dunlap was "a real estate broker in Delaware County." Did that unsworn statement make Mr. Dunlap "prominent" and put him up in business in Philadelphia County as well as Delaware County?

In an exchange between the Court and Mr. Grasberger the Court said: "You have in your charter here that you are to proselyte against the Roman Catholic Church or the Roman Catholic faith. Now I am not a Catholic, but it strikes me right between the eyes,

somehow, as being something wrong with it." To this Mr. Grasberger replied: "If your honor pleases, we are *not proselyting* any *particular* thing."

Yet in his very next statement to the Court Mr. Grasberger said: "If your honor pleases, this organization is formed to proselyte all religions and, *in particular, members of the Roman Catholic faith."* When is a particular thing not particular?

The record is very sketchy on the background of the incorporators, but it does say that one of them (Albert Cameron) is a hairdresser. His testimony in some phases was indeed quite hair-raising. He is the one who said that one day (he did not specify the exact date) he would be present with the Lord. He is also the one who made the original contribution of information that "Jesus Christ was never cantankerous."

The Majority Opinion says that the lower Court "did not question the sincerity of any of them [the incorporators]". Of course, the Court could not question the sincerity of Percy Crawford since he did not show up, although the Court wished to see him: "I want Percy Crawford here. I have heard Percy Crawford over the radio and I have heard him preach and all that, and I want him here on this particular matter." But Percy Crawford did not make an appearance. Although the Court was thus denied an opportunity to appraise the sincerity of Percy Crawford, it did not forbear passing judgment on the other incorporators. Contrary to the Majority's conclusion, the Court of Common Pleas of Delaware County did very emphatically question the sincerity of the other incorporators. The Court refused the charter that they asked for and castigated the incorporators in the following merited language:

"Why are the incorporators insisting upon the inclusion of the objectionable paragraph when they lose nothing by its exclusion? We have a feeling that such insistence stems *from a desire to cause resentment, to draw the fire of the Roman Catholic Church,* the theory being that the resulting publicity would attract attention to the Conversion Center. This court is of the opinion that their inclusion is unnecessary and unwarranted and that they will *constitute a purposeful affront by a small schismatic group* to a respected, organized religious group and that this Court should not lend its assistance to such a result. The unnecessary and controversial words might well lead to a *condition of unrest in the community* and are, we feel, *repugnant to those high-sounding words stated in the proposed Articles, namely: '. . . to promote and encourage understanding and good will among members of all religious groups'.*"

This language can scarcely be interpreted as any laudation of the "sincerity" of the incorporators. To say that a person's action may cause unrest in a community is hardly in keeping with the concept of reputable citizenship. To say that the proposed deeds of the incorporators are *"repugnant"* to their stated purpose is scarcely an affirmation of "sincerity." I should think this statement suggests the incorporators are hypocritical rather than sincere.

The Majority says that "Neither in the court below nor in this Court did anyone appear in opposition to the grant of the charter." In the first place the incorporators did not serve notice on any potential opponents, and it cannot be expected that those who might want to oppose the granting of such a charter would automatically know, even if they should chance to see the inconspicuous legal advertisement, of the ramifications of the intended corporate enterprise.

Nonetheless, it cannot be said that there was no opposition. There is an opposition which does not take the form of visible human beings. That opposition is the concept of Tolerance which in America is present at every public assembly, in every courtroom, and at every council, raising a warning hand against the fomenting of religious hatreds and civic distrust. The spirits of the martyrs who died for religious freedom appeared at the hearing in the lower Court and the Court heard them. They appeared in our Court too, and they will appear every day that this proposed organization belligerently condemns and attacks, with hatred, ignorance, and malice, a religion which was born with the Savior and which, in the United States, numbers over thirty million members.

In intended support of its decision the Majority cites the case of *Minersville School District v. Gobitis*, 310 U. S. 586. In the first place the *Minersville* case is *no longer authority* since it was expressly overruled by the case of *W. Va. Board of Education v. Barnette*, 319 U. S. 624! In the *Minersville* case the Supreme Court of the United States had held that school children who refused to salute the American flag because of their religion (Jehovah's Witnesses) which forbade such a gesture, could not defy reasonable governmental regulation by pleading freedom of religion. Nonetheless, although the *Minersville* case was overruled, the quotation from that decision by the Majority is certainly not opposed to the principle I advance in this case. The Majority quotes as follows: "Government may not interfere with organized or individual expression of belief or disbelief. Propagation of belief—or even of disbelief—in the supernatural is protected, whether in church or chapel, mosque or synagogue, tabernacle or meeting-house. . . .".

The Majority thus emphasizes the very point I am making in this dissent. The government may not interfere with members of the Catholic Church in their expression of belief, but the government will do that very thing when this Court orders the Court of Common Pleas of Delaware County to issue over its seal the authority to Conversion Center to harass and impede, aggressively and militantly, the freedoms of those who embrace the Roman Catholic faith.

The Majority also cites the case of *Cantwell v. Connecticut*, 310 U. S. 296, where Mr. Justice ROBERTS said: "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

Here again we have an eloquent declaration of principles which no constitutional student will gainsay, but the Majority makes no mention of the *facts* in that case which are as far removed from the circumstances in the current litigation as Dan is from Beersheba. In the *Cantwell* case, three men solicited the sale of books which attacked the Roman Catholic Church. They were convicted of certain common law and statutory offenses embracing the acts they committed. The Supreme Court of the United States held that the defendants were exercising their right of free speech and therefore, while engaged in that exercise, were immune from criminal prosecution. If the incorporators in

Conversion Center only sought to sell books, make speeches, and otherwise propagandize against the Roman Catholic Church on their own, they would be free to do so because they could plead freedom of speech. But the incorporators do not stop there. They want to fire their guns of exaggeration, innuendo, and vilification with the banner of the Commonwealth of Pennsylvania flying at their masthead. They pretend they have the right to stencil on every projectile of slander and on every grenade of falsehood the coat of arms of the Commonwealth. That is the difference between the facts in the *Cantwell* case and the facts at bar, and for the Majority to overlook that vital and salient difference is like overlooking the H in H$_2$O.

The Majority Opinion says that "many organizations exist for the purpose of converting members of one particular religious faith to another." Here again the Majority overlooks the H in the H$_2$O. The issue before us is not whether an organization may "exist for the purpose of converting members of one particular religious faith to another." The issue is whether such an organization may obtain from the Courts of this Commonwealth a charter authorizing it to engage in activities which cause unrest, stir up strife, and engender religious hostilities. That is the only issue in this case, and the Majority only builds an additional and useless dome to the courthouse by building up arguments in support of the right of one person or one organization to convert members of another religious faith, which no one does or can dispute. The Majority says further that among those organizations referred to, there exists the St. Paul's Guild, incorporated in New York whose "primary purpose is the conversion of Protestant ministers to Catholicism." The record is *absolutely barren* of any evidence to support the Majority's statement that the St. Paul's Guild's

"primary purpose is the conversion of Protestant ministers to Catholicism." The Majority picked up this statement *ipsissimis verbis*, without the trimming of a twig or leaf, from Mr. Grasberger who said during the hearing, and, of course, not under oath, that the St. Paul's Guild's "primary purpose is the conversion of Protestant ministers."

During the hearing, Judge TOAL asked Mr. Grasberger whether he could cite a precedent where the Court had granted a charter for an organization committed to a religious proselyting campaign. Mr. Grasberger replied that there was such a precedent, and he referred to the charter granted to "Friends of Israel Missionary and Relief Society, Inc." by Court of Common Pleas No. 4 of Philadelphia County. In his brief Mr. Grasberger declared that this charter was granted "to permit proselyting by Christians among members of the Jewish faith." The original papers in this case stated the purposes to be: "The aims and purposes of the said Corporation are to relieve the sufferings of the Jews and Jewish Christians in Central Europe and elsewhere; and to do any and all other acts and things essential to and in furtherance of such aims and purposes; and the same Corporation does not contemplate pecuniary gain or profits, incidental or otherwise, to its members."

The Master, who took testimony in the case, reported: "It needs no great mass of testimony to establish that in certain countries of Central Europe various peoples are being horribly persecuted. Perhaps the greatest brunt of persecution is being borne by those who are of the Jewish faith, or whose parents or grandparents were of the Jewish faith. These people are being driven, or are fleeing, from the countries of their birth to lands where some semblance of freedom persists. Most of them are completely destitute,

and are wholly reliant upon charity for the bare necessities of life. It is the aim of the proposed corporation to collect funds to aid these unfortunate refugees . . . The funds that are collected are to be sent to the International Hebrew Christian Alliance in England, which cares for refugees in hostels set up for that purpose . . ."

Thus, the only possible reference to proselyting was an amendment which read: "To establish and maintain a testimony at home and abroad to the Jewish people that Jesus Christ is the Messiah."

As already stated, but worthy of repetition, the first paragraph of the third section of the application for charter in the instant case reads in part: "The purpose of this corporation shall be to promote the Gospel of our Lord and Savior, Jesus Christ; to foster, promote and encourage understanding and good will among members of all religious faiths, and to discourage the use of violence, boycotts and sanctions by adherents of one religion against adherents of another . . ."

If the incorporators really wished to "foster, promote and encourage understanding and good will among all members of all religious faiths," they could do so without a corporation. They have functioned so far without incorporation. Why must they have the imprimatur of the Court to do what no one could legally object to their doing? Not only would there be no objection to their "fostering, promoting, and encouraging understanding and good will among members of all religious faiths," but the whole decent world would applaud with full heart this kind of activity, for it is in the planting and harvesting of the seed of good will among all peoples that one may find the hope and the promise of mankind for the peace for which everybody longs, as the weary traveler longs for shelter, food, drink, and rest.