538

## Society for Social Responsibility in Science Incorporation

*T. Sidney Cadwallader* of *Cadwallader, Darlington & Clarke*, for petitioner.

*Robert W. Valimont*, contra.

BIESTER, P. J., November 4, 1960.—On October 8, 1957, the applicants filed in the Court of Common Pleas of this county an application for a charter under the Nonprofit Corporation Law of May 5, 1933, P. L. 289, as amended, 15 PS §2851 et seq.

Upon the presentation of the proposed articles of incorporation, the ninth district of the American Legion, by its counsel, appeared before the court as a protestant. In conformity with article II, sec. 207, 15 PS §2851.207, of the Nonprofit Corporation Law of May 5, 1933, P. L. 289, as amended, the court re-

ferred the matter to a master, who subsequently filed a comprehensive report in which he recommended that the charter be granted. To this report the protestant filed a number of exceptions, both to findings of fact and conclusions of law. The court, on March 20, 1959, sustained those exceptions which complained of the master's finding that the purposes of the corporation were accurately and precisely expressed in the application. This order was made without prejudice to the right of the applicants to present new articles of incorporation or present amendments to the original application. On September 4, 1959, the second application for charter was presented to the court, which application was subsequently withdrawn because of the omission of a required averment in the articles. A third application for the granting of the charter was filed on January 30, 1960, it being agreed amongst counsel that the matter be submitted on the record as it existed as of the time of the filing of the master's report, without the necessity of filing exceptions to the new application.

In order to meet the court's criticism of the purposes as stated, the purposes have been restated in the following language:

"To induce, by education and example, individual scientists and engineers to recognize a personal responsibility for the anticipated consequences to society of their work and to always exercise their profession for the benefit of humanity, and hence (a) to provide opportunities for scientists and engineers to seek out alternatives to violence in intergroup relations and to discuss their responsibilities, imposed by their individual consciences, with regard to refraining from the preparation and use of weapons for the destruction of human life; (b) to establish and operate a free employment service for locating positions for those individuals whose consciences cause them to reject some

form of employment as harmful to humanity and to assist individuals who suffer legal or economic difficulties as a result of such a stand; (c) to give technical counsel and assistance in the setting up of humanitarian projects and such as may provide scientists and engineers with occupations of unquestioned humanitarian value; that it is a corporation which does not contemplate pecuniary gain or profit, incidental or otherwise, to its members."

Although these purposes might conceivably be further clarified, it appears to us that the wordage now used conveys a reasonably clear statement of the objectives of the corporation and, viewed in the light of the testimony presented before the master, is sufficiently clear to require us to determine whether a charter should be granted.

Unchallenged findings of the master and a reading of the testimony before him permits us to find the society has functioned as an unincorporated association since 1949; that amongst its members are scientists and engineers of considerable scientific stature, some having been Nobel prize winners; that, although having no allegiance to any religious group, many of its members are also members of the Society of Friends.

The primary purpose is to induce by education and example, alternatives to violence with "regard to refraining from preparation and use of weapons for the destruction of human life." It is clear that stripped of all unnecessary verbiage, this corporation is designed to persuade scientists and engineers that their work in preparing this country for an atomic war, and their devotion to the cause of making weapons having the capacity of massive destruction, is a disservice to mankind and should be discontinued.

The basic objection voiced by the protestant is that such endeavor, if successful, will destroy, or at least greatly lessen, our military striking power; that our

approval of such a charter would result in a weakening of our defenses and, therefore, its purposes should be found to be unlawful and injurious to the community, although the master found to the contrary.

Article II, sec. 207 of the Nonprofit Corporation Law provides as follows:

"The court shall consider the application. It may hear evidence, if any there be, on behalf of the applicants and against the application, or it may refer the application to a master to make report as to the propriety of granting the application. In such case, upon the filing of the master's report, the court shall grant the applicants and protestants a hearing, if exceptions are filed by either of them. If the court shall find the articles to be in proper form and within the provisions of this act, *and the purpose or purposes given in the articles to be lawful and not injurious to the community, . . . the court shall so certify on the articles*, and *shall* order and decree thereon that the articles are approved and that, upon the recording of the articles and the order, the corporation shall come into existence for the purpose or purposes and upon the terms stated therein; otherwise, the court shall refuse the application for a charter." (The italics supplied are the same as in the recent case of Conversion Center Charter Case, 388 Pa. 239.)

It is, therefore, this court's duty to satisfy itself that the proposed purposes of the corporation are "lawful and not injurious to the community." If we are so satisfied, and all of the other requirements of the statute are complied with, we are required to grant the charter. "Whether the court, because of personal predilection on the subject, does not wish it to appear that it approves of the purposes of the corporation, is beside the point": Conversion Center Charter case, supra, page 243. Obviously, were it otherwise, and charters were granted or not, dependent upon the indi-

vidual sympathies or antipathies of a particular court, or a member thereof, absurd results would follow.

Article I, sec. 7, of the Constitution of this Commonwealth provides, inter alia:

"The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

This freedom of speech and press, also guaranteed by amendments I and XIV of the Federal Constitution, are basic in our democratic form of government and to suppress them because any arm of the government regards the idea advanced as being fallacious or unwise, in the judgment of the proscriber, would be a grave encroachment upon our system of government, for "the maintenance of the opportunity for free political discussion to the end that government may be responsible to the will of the people and that changes may be obtained by lawful means is a fundamental principle of our constitutional system": Fitzgerald v. Philadelphia, 376 Pa. 379; Stromberg v. California, 283 U. S. 359, 369.

It matters not whether the ideas advanced are unorthodox, controversial, even hateful to the prevailing climate of public opinion, they still have the full protection of the constitutional guarantees, unless excludable because they encroach upon the limited area of more important interests: Roth v. United States, 354 U. S. 476, 484, 1 L. Ed. 2d 1498, 1507.

The right to advance such ideas and philosophies by the association of persons of like mind is implicit in these guarantees. Thus, in National Association for the A. C. P. v. Alabama, 357 U. S. 449, 460, 2 L. Ed. 2d 1488, 1499, the court says:

"Effective advocacy of both public and private points of view, particularly controversial ones, is un-

deniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. DeJonge v. Oregon, 299 U. S. 353, 364; Thomas v. Collins, 323 U. S. 516, 530. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. See Gitlow v. New York, 268 U. S. 652, 666; Palko v. Connecticut, 302 U. S. 319, 324; Cantwell v. Connecticut, 310 U. S. 296, 303; Staub v. City of Baxley, 355 U. S. 313, 321. Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."

We have no doubt that the protestant is motivated by the highest ideals of patriotism, in its contention that the advancement of the philosophy of the members of the proposed corporation would be inimical to the best interests of the United States. We also recognize that civil liberties are not absolute and free from qualification; that there are circumstances where the conflicting interest of public order supersedes, and reasonable restraint becomes necessary in the service of an interest essential to the life of the community. Subject to this limitation, not applicable here, it is not for this Court to determine whether a particular philosophy or belief, whether it relates to political, economic, religious or other matters, is sound or unsound, right or wrong, or whether we agree with the philosophy propounded.

Since we are of the opinion that the purposes set forth in the articles of incorporation are not unlawful or injurious to the public, we make the following

544

*Order*

And now, to wit, November 4, 1960, the exceptions to the report of the master are overruled and refused and the court approves the incorporation of the Society for Social Responsibility in Science.