339 A.2d 520

**In re ESTATE of Elizabeth V. LANING, Deceased.**

**Appeal of HOME FOR HOMELESS WOMEN.**

Supreme Court of Pennsylvania.

Argued Nov. 26, 1974.

Decided May 13, 1975.

Rehearing Denied July 7, 1975.

158

Frank Townend, Wilkes-Barre, Frank Townend, Silverblatt & Townend, for appellant.

Albert H. Aston, Aston, Fine, McHugh, Caverly, Wetzel & Geist, Wilkes-Barre, for appellee, Benjamin Musser.

Arthur L. Piccone, for appellee, Estate of Nancy Musser Harper.

Before O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

The will of Elizabeth Laning bequeathed her entire estate to a trustee, directing that the income be paid to her adopted daughter, Helen Laning Musser, for life and the corpus then distributed to "such of the lineal heirs of my daughter . . . as there are, at the time the youngest arrives at the age of twenty-one years, members in good standing of the Presbyterian Church." In the absence of qualifying grandchildren, the corpus was to pass to appellant Home for Homeless Women. After the death of the life tenant the trustee filed a final account and sought directions as to the distribution of the trust estate.

Appellees, the children of Helen Laning Musser,[1] although admitting that they are not and never have been members of the Presbyterian Church claim the estate on the ground that the condition of membership is unenforceable. Appellant maintains that the condition is valid and precludes appellees from receiving any interest in the trust corpus. The orphans' court concluded that the condition of membership is unforceable both because it is

---

1. Helen Musser bore three children who survived to the age of twenty-one: Benjamin, Frederick, and Nancy. Frederick, now a Franciscan monk, has assigned his interest to Benjamin. Nancy is now deceased and her interest is represented by William Harper, her widower and administrator of her estate.

contrary to the public policy of Pennsylvania and because the Fourteenth Amendment forbids any state to give effect to such a condition. This appeal followed.[2] We reverse.

Because the claim that the condition is contrary to public policy, if resolved in favor of appellees, would obviate the need to resolve the constitutional question, that claim must be considered first. In support of the contention that the condition is contrary to public policy, appellees cite *Drace v. Klinedinst*, 275 Pa. 266, 118 A. 907 (1922), and *Devlin's Trust Estate*, 284 Pa. 11, 130 A. 238 (1925). However, these cases are distinguishable.

In *Drace*, the testator devised certain land to his son for life and thereafter to his son's children "provided they remained faithful to a particular religion; and in case any of them forsook this religion, 'then and in that case, to the remaining children who remain true' to this religion." 275 Pa. at 267, 118 A. at 908. The children "remained faithful" until some time after the death of their father, but then left that church and joined another. When they sought to convey the property, the purchaser questioned the marketability of the title, fearing that breach of the religious condition might have divested the children of title. This Court held that 1) the language of the will was not sufficient to render defeasible the estate devised and 2) even if the language would otherwise create a defeasible estate, the enforcement of the forfeiture would be contrary to the public policy of this Commonwealth.

In our view, the key to the *Drace* holding is the fact that the will sought to require the remaindermen to "remain true" to the specified religion. Enforcement of this condition would thus require a determination of the doctrines of that religion and an inquiry as to whether

**2.** Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, § 202(3), 17 P.S. § 211.202(3) (Supp.1974).

the remaindermen had "remained true" to those doctrines. Such questions are clearly improper for a civil court to determine. Indeed, it is apparent from the unanimous decision of the United States Supreme Court in *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), that civil courts are constitutionally forbidden to make such determinations.

In the *Presbyterian Church* case, the courts of Georgia had undertaken to resolve a dispute over the right to church property by determining whether the denomination had substantially departed from the tenets of faith and practice existing at the time when the congregation had affiliated with the denomination. The Supreme Court unequivocally condemned such intrusion into ecclesiastical affairs by civil courts:

> "[T]he departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular church doctrine and the importance of these doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role."

Id. at 450, 89 S.Ct. at 607.

Not only would the condition in *Drace* have required improper inquiries into the content of religious doctrine, but the intrusion into the ecclesiastical domain would have been magnified by the need to probe into the beliefs of the remaindermen. In contrast, the bequest involved here requires no inquiry into either doctrine or belief. All that need be determined is whether the beneficiaries are or are not *members* of the specified church.[3]

---

3. We construe membership "in good standing" to mean only formal affiliation with the specified church. Any other construction could entail inquiry into doctrine or belief, and would thus lead to invalidity and the consequent frustration of the testatrix's intention. See *Funk Estate*, 353 Pa. 321, 325, 45 A.2d 67, 70 (1946);

*Devlin's Trust Estate,* 284 Pa. 11, 130 A. 238 (1925), also relied upon by appellees, is equally inapposite. There a trust was created for the benefit of settlor's three-year old grandson, provided that he was "reared in the Roman Catholic faith." The inquiry necessary to administer this condition was apparently limited to the obtaining of two certificates annually: one attesting to the grandson's attendance at a Roman Catholic school and one "from the Roman Catholic Priest of the parish in which [the grandson] resides that the child is being brought up and reared in the Roman Catholic faith." In an action for a declaratory judgment, this Court held the condition to be against public policy and therefore void.

In our judgment, the vice of the condition in *Devlin* inhered in its obvious purpose: to compel the child's Protestant mother to rear him in the faith of his deceased father, instead of her own faith. The probable effect of this would be disruption of the child's relationship with his only surviving parent. In view of the central role of the parent in the development of the child to responsible adulthood, enforcement of a condition which would so disrupt the relationship is contrary to public policy. *In re Borwick* [1933] Ch. 657;[4] see 1 A. Scott, Law of Trusts § 62.5, at 582–84 (3d ed. 1967), and cases there cited; 2 G. G. Bogert & G. T. Bogert, Law of Trust and

Restatement of Property § 243(c) (1940); 5 American Law of Property § 21.3, at 131 (A. J. Casner ed. 1952).

4. Settlor created a trust to pay income to his daughters for life, to provide for the support and education of the children of any daughter who died during the minority of those children, and to give the corpus to the children after their mother's death upon their coming of age. He provided that any child of his daughter who became a Roman Catholic before obtaining a vested interest should forfeit all rights under the trust. One of the daughters married a Roman Catholic and their children were baptized Catholics. The condition was held unenforceable both because of the disruption of the parent-child relationship and because parents ought to instruct their children in religious matters solely with a view to the moral and spiritual welfare of the children and not with regard to mercenary considerations.

Trustees § 211, at 438 (2d ed. 1965); cf. *Girard Trust Co. v. Schmitz*, 129 N.J.Eq. 444, 20 A.2d 21 (1941) (condition that adult siblings have no communication or intercourse with one another void as against public policy); Restatement (Second) of Trusts § 62, comments f. & g. (1959); Restatement of Property § 433 (1944); 6 American Law of Property § 27.19 (A. J. Casner, ed. 1952).

The provision involved here presents no such tendency to disrupt the relationship of parent to minor child. The testatrix expressed no concern for the religious education of her grandchildren, for the condition deals only with their status at the time when the youngest among them becomes twenty-one. The effect of the condition, then, is only to offer an inducement to the testatrix's *adult* grandchildren to adhere to her faith. To be sure, this may have some disruptive effect on familial relationships among adults, but this effect is of far less social concern. "However desirable it may be that adult relatives live in harmony, the family relationships on which our social structure has been thought to depend are those between husband and wife and parent and child." 6 American Law of Property § 27.19, at 672 (A. J. Casner, ed. 1952). Once the child has grown to adulthood, the key role of the parent diminishes and the relationship, while still quite special, more nearly approximates that between other relatives.

While both of the cases cited by appellees are thus distinguishable, certain language in the opinions does offer support for their positions. In *Drace*, Justice Kephart conceived our constitution's guarantee that "no human authority can, in any case whatsoever, control or interfere with the rights of conscience" [5] as expressing a broad policy against private as well as public distinctions based on religious belief.

---

5. Pa.Const., art. I, § 3.

"Testator's will violated this public policy. He wished to force his lineal descendants to adhere to a certain religious faith, under penalty of the loss of what might be termed their inheritance. Such penalty, of course, was in the nature of a punishment, and, while not as severe, physically, as the stocks, pillory, the whipping post and other forms of physical chastisement, it would have a more lasting effect, and would be likely to produce results. If we were to adopt appellant's view, that such condition should be sustained, we would not only contravene this announced policy, but we would, by that authority, originate the first step to mark the entering wedge whereby, through successive encroachments, the worship of God according to a given religious persuasion could be controlled and compelled indefinitely through the disposition of property at death. It would be a step backward, looking to the days of religious persecution, and it is our duty to stop this effort in its inception."

275 Pa. at 270, 118 A. at 909.

We think this statement too broad. None will deny that if the testatrix still lived she would be entitled to attempt, by material inducements as well as verbal exhortations, to persuade her grandchildren to adopt her religious faith as their own. Our law permits an individual, through the use of trustees, to continue exercising some dominion over property after death—not perpetually as feared by Justice Kephart, but for a time which has proven a workable compromise between the interests of property owners and the needs of society. See Probate, Estate, and Fiduciaries Code, 20 Pa.C.S. § 6104(b) (Special Pamphlet, 1974). Inasmuch as the result which the testatrix sought to accomplish is neither illegal, immoral, tortious, or productive of any social evil, we see no basis upon which she should be denied the power to dispose of her property in this fashion.

This conclusion is bolstered by the fact that it is supported by the weight of authority. *Delaware Trust Co. v. Fitzmaurice,* 27 Del.Ch. 101, 31 A.2d 383 (Ch.1943), modified on other grounds, 27 Del.Ch. 374, 38 A.2d 463 (Sup.1944); *Kempf's Will,* 252 App.Div. 28, 297 N.Y.S. 307 (4th Dep't), aff'd mem., 278 N.Y. 613, 16 N.E.2d 123 (1937); *Lessor's Estate,* 158 Misc. 895, 287 N.Y.S. 209 (1936); *Magee v. O'Neill,* 19 S.C. 170, 45 Am.Rep. 765 (1883); *James' Estate,* 273 Wis. 50, 76 N.W.2d 553 (1956); *Paulson's Will,* 127 Wis. 612, 107 N.W. 484 (1906); Restatement of Property § 434 & comment a. (1944);[6] 6 American Law of Property § 27.20, at 674 (A. J. Casner, ed. 1952);[7] contra, *Maddox v. Maddox's Adm'r,* 52 Va. (11 Gratt.) 804 (1854).

[6] "§ 434. PROVISIONS CONCERNING RELIGION.
"Except as stated in § 433 [Provisions Detrimentally Affecting the Relation of Parent and Infant Child], an otherwise effective condition precedent, special limitation, condition subsequent or executory limitation which is designed to prevent the acquisition or retention of an interest in land or in things other than land in the event of certain religious beliefs or affiliations is valid if the conveyee is a member of the family of the conveyor.
"COMMENT:
"a. RATIONALE. Generally society is not concerned with either the particular religious creed of the individual or the sincerity of his beliefs. The individual is normally free, not only to believe as he chooses, but to promote his theological views among others. The rule stated in this Section validates such an attempted promotion of religious views where that promotion takes the form of a restraint annexed to a gift of property and where the person imposing the restraint occupies a sufficiently close relationship to the conveyee to have a legitimate interest in his religious beliefs. . . ."

[7] "The often-heard reminder that a condition or limitation in a dispositive instrument imposes no obligation and brings to bear no coercion which the beneficiary is not free to ignore seems sufficient to dispose of any contention that there is a civil liberties problem in these cases. One should not be heard to say that religious freedom has been denied him because he values it less highly than a pecuniary benefit. If these provisions are to be held illegal, it must be on some finding that the inducement they hold out encourages behavior which is harmful to society, or that the purpose of one who holds out such an inducement is unnatural or offensive. The only charge which has been heard so far in this respect is that these provisions encourage hypocritical and counterfeit religious beliefs and practices. Does not this charge

■ Having concluded that the condition is not contrary to public policy, we must reach appellees' constitutional contention. The foundation of their argument is *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948),[8] which held that the Fourteenth Amendment forbids a state to grant judicial enforcement to a racially restrictive covenant in a deed to real property. From this they argue that judicial enforcement of the religious condition in this case is equally the act of the state and forbidden by the Fourteenth Amendment. Assuming, without deciding, that appellees are correct in contending that judicial enforcement of the condition is "state action" within the meaning of the Fourteenth Amendment,[9] we conclude that it is not forbidden by that amendment.

make too much of denominational differences? Particular creeds may be stressed by particular churches, but most religious institutions are thought to promote the public good, and insofar as public policy is concerned, an inducement to adhere to one may be justified despite the possibility that it may not be the denomination of the beneficiary's own choice."

8. The orphans' court also relied on *Pennsylvania v. Brown*, 392 F.2d 120 (3rd Cir. 1968) (en banc), which held that judicial removal of the Board of City Trusts and substitution of private trustees in order to effectuate the racially discriminatory provisions of the will of Stephen Girard violated the Fourteenth Amendment.

9. A few of the leading scholarly efforts to formulate a theory of state action are: Karst & Horowitz, Reitman v. Mulkey: A Telophase of Substantive Equal Protection, 1967 Supreme Court Rev. 39; Black, Foreward: "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69 (1967); Silard, A. Constitutional Forecast: The Demise of the "State Action" Limit on the Equal Protection Guarantee, 66 Colum.L.Rev. 855 (1966); Henkin, Shelley v. Kraemer: Notes for a Revised Opinion, 110 U. Pa.L.Rev. 473 (1962); Lewis, The Meaning of State Action, 60 Colum.L.Rev. 1083 (1960); Pollak, Racial Discrimination and Judicial Integrity: A Reply to Professor Wechsler, 108 U.Pa.L.Rev. 1 (1959); Horowitz, The Misleading Search for "State Action" Under the Fourteenth Amendment, 30 So.Cal.L.Rev. 208 (1957). A more exhaustive list will be found in Van Alstyne, Mr. Justice Black, Constitutional Review, and the Talisman of State Action, 1965 Duke L.J. 219, 231 n. 24.

■ At the outset, we think it clear that the provisions of Pennsylvania law providing for the judicial enforcement of testamentary conditions, whether religious or otherwise, do not constitute a "law respecting an establishment of religion." Here the state does not have the forbidden purpose of advancing a particular religious doctrine, compare *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (law forbidding the teaching of the doctrine of evolution in the public schools), for the courts stand ready to effectuate the testator's intention without regard to what religious or irreligious doctrine he wishes to advance. Nor does this entail expenditure of public resources in a manner which advances or inhibits religion, compare, e. g., *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), with *Walz v. Tax Commission*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), but rather the disposition by a private individual of her own property. See *Quick Bear v. Leupp*, 210 U.S. 50, 28 S.Ct. 690, 52 L.Ed. 954 (1908) (United States may constitutionally appropriate Indian trust funds to provide sectarian education requested by the Indian beneficiaries of the trust). Finally, there is here no entanglement of church and state such as was condemned in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

While it is thus clear that no problem of establishment of religion is presented, it cannot be denied that there is an impact upon appellees' free exercise of religion. If the condition is enforced, then their adherence to their faith will prevent them from receiving substantial legacies. However, it must be remembered that this does not impose any loss on them, for they never had any claim upon the bounty of the testatrix unless they satisfied the conditions she attached to it.

■ Moreover, the state is not entirely forbidden to impose costs on the free exercise of religion where this is

necessary to the fulfillment of a compelling state purpose. Thus, in *Braunfeld v. Brown,* 366 U.S. 599, 81 S. Ct. 1144, 6 L.Ed.2d 563 (1961), the Supreme Court upheld a law prohibiting retail sales on Sunday, even as applied to Orthodox Jews whose religion required that they close their stores on Saturday. While the law did tend to seriously disadvantage the plaintiffs as against competitors who remained open on Saturdays, it was sustained because no alternative would adequately serve the state's interest in providing a single uniform day of rest to the entire community. Here no alternative will permit the state to accomplish its purpose of allowing testators to dispose of their property as they please.

■■ Given the more direct impact in this case, as compared to *Braunfeld,* it is necessary that the state purpose be especially compelling to justify it. However, the state interest in this case is unusually compelling. This is so because the testatrix sought by this bequest to further her own free-exercise interest in seeking adherents to her faith. As this Court said in *Conversion Center Charter Case,* 388 Pa. 239, 245, 130 A.2d 107, 110 (1957):

> "The 14th Amendment of the Constitution of the United States which incorporates the 1st Amendment, guarantees the free exercise of religion as does Article I, Section 3 of the Constitution of Pennsylvania. Not only is a citizen of this country entitled to the free expression of his religious beliefs, but he may by peaceful persuasion endeavor to convert others thereto, and we are aware of no bar to individuals organizing to effectuate their guaranteed rights in this regard."

Accord, *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

■ Of course we need not say that the testatrix had a constitutional right to have the condition enforced, for a state may accommodate a free exercise interest which does not amount to a constitutional right. See *Gillette v.*

*United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (exemption from military draft for conscientious objectors not constitutionally required). In view of the clash of First Amendment interests presented in this situation, we cannot say that it is unconstitutional for the state to grant judicial enforcement to the dispositive provision here in issue.

Decree reversed and case remanded with instructions to enter a decree in accordance with this opinion. Each party pay own costs.

JONES, C. J., and EAGEN, J., did not participate in the consideration or decision of this case.

NIX, J., filed a dissenting opinion in which MANDERINO, J., joined.

NIX, Justice (dissenting).

I cannot accept the majority's conclusion that the condition imposed in the instant trust was one that was not in violation of the public policy of this Commonwealth. I am therefore obliged to dissent.

This Court, as long ago as 1922, recognized as a fundamental precept of this Commonwealth the right of self-determination of every citizen in the exercise of his or her religious persuasion and practice.

The right of the citizens of the Commonwealth to worship God in accordance with the dictates of their own conscience is a landmark of the old colony. It was, in fact, one of the chief reasons for its establishment. The charter grant was in the early part of 1682, and, in the same year, the proprietor enacted, with the consent and advice of the deputies, in the first chapter of the laws, "That no person, now, or at any time hereafter, living in this province, who shall confess and acknowledge one Almighty God to be the Creator, Upholder and Ruler of the world,

. . . . . . . . . . . . shall in any case be molested or prejudiced for his, or her conscientious persuasion or practice. Nor shall he or she at any time be compelled to frequent or Maintain any religious worship, place of Ministry whatever, contrary to his or her mind, but shall freely and fully enjoy his, or her, Christian Liberty in that respect, without any interruption or reflection": Duke of York's Laws, p. 107.

This provision was reënacted later, though it was still later subjected to certain modifications and changes; these were subsequently removed and it is substantially the law of the Commonwealth to-day, through the Constitution of the United States as well as through our own Bill of Rights, section III, of the latter (1 Purd.Dig. 117), declaring that "no human authority can, in any case whatever, control or interfere with the rights of conscience."

*Drace v. Klinedinst*, 275 Pa. 266, 269, 270, 118 A. 907 (1922).

The same sentiments were again reiterated by this Court in *Devlin's Trust Estate*, 284 Pa. 11, 130 A. 238 (1925):

"The rearing of a child from three years of age until he is twenty-one 'in the faith,' covering as it does the formative period of life, necessarily tends to bar the exercise of religious freedom, and, though the motives of the grandfather, in so providing, were doubtless sincere, yet, under the public policy, as expressed in this State, such a condition is inoperative and void.

We can see no reason to distinguish the present case from the rule laid down in *Drace v. Klinedinst*, 275 Pa. 266. It was there held that a provision made by will, dependent on the devisee remaining attached to a particular church, was void. This court, through Justice Kephart, there said, in part: 'Testator's will violated this public policy. He wished to force his lineal descendants to adhere to a certain religious faith, under

penalty of the loss of what might be termed their inheritance. . . . If we were to adopt appellant's view, that such condition should be sustained, we would not only contravene this announced policy, but we would, by that authority, originate the first step to mark the entering wedge whereby, through successive encroachments, the worship of God according to a given religious persuasion could be controlled and compelled indefinitely through the disposition of property at death.' "

*Id.* at 14–15, 130 A. at 239.

Each of these decisions were emphatic in stressing that the policy of this Commonwealth assures each of its citizens the right to worship the God of their choice in a manner in accordance with their conscience. Pursuant to that precept, our Court has refused to recognize restrictions by testators, or settlors, regardless how craftily designed, which encroach upon this freedom of choice.

In a strained attempt to distinguish the instant facts from earlier precedents, the majority first states that the key to *Drace* was that the condition imposed required the Court to make a determination of doctrine and to inquire into the remainderman's adherence to that doctrine. Here they contend that the Court need only to determine whether the beneficiaries are members of a specified church. This reasoning is clearly fallacious. First, the condition imposed required the heir not only to be a member of the Presbyterian Church, but also a *member in good standing*. I fail to perceive any difference between a determination as to whether a person has remained true to a particular sect or whether or not he is in good standing within that sect. If religious freedom is to depend upon semantics, the protections afforded by this public policy are little more than illusory.

Further, I fail to perceive why there was any greater need in *Drace* to inquire into doctrine than there is as a result of the presently challenged condition. In *Drace*

there was no question as to the religious faith to which the testator intended his descendants to adhere. Nor was there any question that the remainderman did, in fact, abandon that faith. Thus, there was no need in that instance to inquire into the question of doctrine, but the Court, nevertheless, recognized the provision as offensive and stated most appropriately:

> *"It would be a step backward, looking to the days of religious persecution, and it is our duty to stop this effort in its inception." Id.* 275 Pa. at 270, 118 A. at 909. (Emphasis added)

Unfortunately the majority has failed to recognize the wisdom of that admonition.

The facts in *Devlin* are even closer to the instant case. There, there may have been some justification for the testator's request in view of the fact that his deceased son, the father of the beneficiary in question, had entered into a premarital agreement with the child's mother to rear the child in the faith that was made part of the condition. Further, the restriction in *Devlin* did not forever bind the beneficiary but only required that his training, during minority, be in accordance with a given faith. Nevertheless, the Court rejected this intrusion. Nowhere in that opinion was that rejection predicated upon a disruption of family unity as the majority would suggest. The tortuous distinction made by the majority in this instance only emphasizes the extent to which it has gone to justify abandoning a precedent.

In my judgment both *Drace* and *Devlin* were properly decided and are controlling under the present facts. I would therefore affirm the decree of the court below.

MANDERINO, J., joins in this opinion.